# Illinois Official Reports

## Appellate Court

---

*Midwest Gaming & Entertainment, LLC v. County of Cook*,
**2015 IL App (1st) 142786**

---

Appellate Court
Caption

MIDWEST GAMING AND ENTERTAINMENT, LLC, Plaintiff-Appellee, v. THE COUNTY OF COOK, THE COOK COUNTY DEPARTMENT OF REVENUE, and ZAHRI ALI, as Director of the Cook County Department of Revenue, Defendants-Appellants.

District & No.

First District, Fifth Division
Docket No. 1-14-2786

Filed

August 21, 2015

Decision Under
Review

Appeal from the Circuit Court of Cook County, No. 13-CH-15736; the Hon. Robert Lopez Cepero, Judge, presiding.

Judgment

Reversed.

Counsel on
Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Daniel F. Gallagher, Kent S. Ray, and James Beligratis, Assistant State's Attorneys, of counsel), for appellants.

Christopher B. Wilson, of Perkins Coie LLP, and David A. Hughes, of Horwood Marcus & Berk Chtrd., both of Chicago, for appellee.

| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1 The instant appeal arises from the trial court's grant of summary judgment in favor of plaintiff Midwest Gaming and Entertainment, LLC, the owner and operator of Rivers Casino in Des Plaines, which operated to strike down the Cook County Gambling Machine Tax Ordinance (the Tax Ordinance) (Cook County Ordinance No. 12-O-62 (approved Nov. 9, 2012)). The trial court found that the Tax Ordinance: (1) was preempted by the Riverboat Gambling Act (230 ILCS 10/1 *et seq.* (West 2012)), (2) constituted an impermissible tax upon occupations in violation of the Illinois Constitution, (3) constituted an impermissible license for revenue in violation of the Illinois Constitution, and (4) violated the uniformity clause of the Illinois Constitution. Defendants, the County of Cook, the Cook County Department of Revenue, and the Director of the Cook County Department of Revenue (collectively, the County), appeal and, for the reasons that follow, we reverse.

¶ 2 BACKGROUND
¶ 3 I. Tax Ordinance
¶ 4 On November 9, 2012, the County enacted the Tax Ordinance, which imposed registration and tax requirements on "Gambling Machines" displayed for play or operation by the public within the County. "Gambling Machines" were defined as either a "Gambling Device" as defined by the Tax Ordinance or a "video gaming terminal" as defined by the Video Gaming Act (230 ILCS 40/5 (West 2012)). Cook County Ordinance No. 12-O-62, § 74-626 (approved Nov. 9, 2012). A "Gambling Device" was defined by the Tax Ordinance as "a machine or mechanical, electrical, or electronic device utilized in or primarily designed for gambling, and includes any clock, tape machine, slot machine, video machine, or other machine, for the reception of money or other thing of value on chance or skill is staked, hazarded, bet, won or lost, but does not include gambling devices excepted from the Illinois Criminal Code, 720 ILCS 5/28-2(a)(1) through 5/28-2(a)(4) or video gaming terminals, as defined in the Illinois Video Gaming Act, 230 ILCS 40/5." Cook County Ordinance No. 12-O-62, § 74-626 (approved Nov. 9, 2012). A "Video Gaming Terminal" was defined by the Tax Ordinance nearly identically with its definition in the Video Gaming Act, and was defined as "any electronic video game machine that, upon insertion of cash, is available to play or simulate the play of a video game, including, but not limited to, video poker, line up, and blackjack, utilizing a video display and microprocessors in which the player may receive free games or credits that can be redeemed for cash and as further defined under the Video Gaming Act, 230 ILCS 40/5. The term does not include a machine that directly dispenses coins, cash, or tokens or is for amusement purposes only." Cook County Ordinance No. 12-O-62, § 74-626 (approved Nov. 9, 2012). Thus, according to the Tax Ordinance, a slot machine at a casino would be a typical gambling device, while a video poker machine at a bar or restaurant would be a typical video gaming terminal. Both machines would be considered gambling machines.

¶ 5 Under the Tax Ordinance, all owners of gambling machines to be played or operated by the public at any place in the county, and those people currently displaying gambling machines to be played or operated by the public at any place owned or leased by them, were required to register with the County's Department of Revenue that they owned or displayed such gambling machines by June 21, 2013. Cook County Ordinance No. 12-O-62, § 74-627(a) (approved Nov. 9, 2012). Additionally, the Tax Ordinance imposed a tax upon each gambling machine that was displayed by a person for play or operation by the public in the county (the tax). Cook County Ordinance No. 12-O-62, § 74-628 (approved Nov. 9, 2012). The Tax Ordinance imposed separate tax rates for gambling devices and video gaming terminals. For gambling devices, the Tax Ordinance imposed an annual tax of $1,000 per gambling device, while for video gaming terminals, the Tax Ordinance imposed an annual tax of $200 per video gaming terminal. Cook County Ordinance No. 12-O-62, § 74-628(a), (b) (approved Nov. 9, 2012). Both subsections provided that "said tax shall be paid by the owner." Cook County Ordinance No. 12-O-62, § 74-628(a), (b) (approved Nov. 9, 2012).

¶ 6 Before any gambling machine was made available for use by the public, the owner was required to remit the tax due to the Department of Revenue, after which the director would issue a tax emblem to be affixed to the gambling machine as evidence of the payment. Cook County Ordinance No. 12-O-62, § 74-629 (approved Nov. 9, 2012). The Tax Ordinance provided that "[n]o owner or person shall make a Gambling Machine available for play or operation by the public in the county unless (1) the tax has been paid on said Gambling Machine and is evidenced by the tax emblem conspicuously affixed to the Gambling Machine; and (2) the Gambling Machine is plainly labeled with the name, address and telephone number of the person displaying the Gambling Machine for play or operation by the public, and such information as may be required by the director through policy, procedure, rule, or form." Cook County Ordinance No. 12-O-62, § 74-629(c) (approved Nov. 9, 2012).

¶ 7 The Tax Ordinance provided that it was unlawful for any owner or person to display a gambling machine for play or operation by the public within the county unless (1) the owner of the gambling machine and the person displaying it registered with the Department of Revenue; (2) the tax was paid and was evidenced by the presence of the tax emblem conspicuously affixed to the gambling machine; and (3) the gambling machine was labeled with the name, address, and telephone number of the owner of the gambling machine. Cook County Ordinance No. 12-O-62, § 74-634(a) (approved Nov. 9, 2012). If, at any time, a gambling machine did not bear the tax emblem, the owner of the gambling machine and the person displaying the gambling machine would be jointly and severally liable for a fine of $1,000 for a first offense and $2,000 for any subsequent offense. Cook County Ordinance No. 12-O-62, § 74-634(a) (approved Nov. 9, 2012). The Tax Ordinance provided that "[e]very day such violation continues shall constitute a separate and distinct offense." Cook County Ordinance No. 12-O-62, § 74-634(a) (approved Nov. 9, 2012).

¶ 8 The Tax Ordinance provided that representatives of the County's Department of Revenue "shall be permitted to inspect any premises for the display of Gambling Machines" (Cook County Ordinance No. 12-O-62, § 74-636 (approved Nov. 9, 2012)) and further provided that "[i]t shall be unlawful for any owner or person to prevent, or hinder a duly authorized Department representative from performing the enforcement duties provided in this Article" (Cook County Ordinance No. 12-O-62, § 74-636 (approved Nov. 9, 2012)). Finally, the Tax Ordinance provided that "[t]he department [of revenue] shall enforce this Article and the

Sheriff and the Sheriff's Police are authorized to assist the Department, in said enforcement, including issuing citations hereunder." Cook County Ordinance No. 12-O-62, § 74-639 (approved Nov. 9, 2012). The Tax Ordinance also gave rulemaking authority to the Department of Revenue, providing that "[t]he department may promulgate policies, procedures, rules, definitions and forms to carry out the duties imposed by this ordinance. As far as practicable in accordance with the purposes of this ordinance, such procedures, regulations, rules, policies, and forms shall be consistent with the practices of the Gambling Machine industry." Cook County Ordinance No. 12-O-62, § 74-637 (approved Nov. 9, 2012).

¶ 9 The parties agree that the Tax Ordinance became effective on June 1, 2013. However, the parties "agree[d] to a Standstill of the tax at issue" until "the merits of this case are finally resolved."

¶ 10 II. Complaint

¶ 11 On June 27, 2013, plaintiff filed a verified complaint for injunctive relief and for declaratory judgment. Plaintiff alleged that it was the owner and operator of Rivers Casino in Des Plaines, Illinois, and was the only licensed casino operator in Cook County. Plaintiff registered over 1,000 machines pursuant to the Tax Ordinance under protest and sought an injunction to bar the application and enforcement of the Tax Ordinance. Plaintiff argued that the County did not have the authority to impose the tax because (1) the Riverboat Gambling Act prohibited the imposition of such a tax, (2) the tax was an impermissible "occupation tax" (Ill. Const. 1970, art. VII, § 6(e)), (3) the tax was a "license for revenue" prohibited by the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(e)), and (4) the tax was unconstitutional because it did not treat all gambling machines uniformly (Ill. Const. 1970, art. IX, § 2). Accordingly, plaintiff sought "injunctive relief barring Cook County from enforcing this tax and from otherwise improperly interfering with [plaintiff's] lawful operations."

¶ 12 Count I of the complaint alleged that the Riverboat Gambling Act gave exclusive jurisdiction to the Illinois Gaming Board and that the Tax Ordinance improperly interfered with that exclusive jurisdiction. Count I alleged that "the comprehensive regulatory structure imposed by the Riverboat Gambling Act upon licensees, including the creation of the exclusive jurisdiction and authority of the Illinois Gaming Board, prevents any attempt by an individual county such as the County of Cook to exercise taxing or regulatory authority over licensees such as [plaintiff]." Count I sought a declaration that the Riverboat Gambling Act prohibited the County from imposing the tax; and a temporary, preliminary, and permanent injunction enjoining the imposition and enforcement of the tax against plaintiff.

¶ 13 Count II of the complaint alleged that the Tax Ordinance imposed an impermissible occupation tax on plaintiff. Count II alleged that the Illinois Constitution prohibited a home rule unit such as the County from enacting an occupation tax and further alleged that the Riverboat Gambling Act contained an express prohibition against occupation taxes. Count II sought a declaration that the tax violated the Illinois Constitution as an illegal occupation tax; and a temporary, preliminary, and permanent injunction enjoining the imposition and enforcement of the tax against plaintiff.

¶ 14 Count III of the complaint alleged that the tax violated the Illinois Constitution because it was a license for revenue which was impermissible without the explicit approval of the General Assembly. Count III sought a declaration that the tax violated the Illinois Constitution

as a license for revenue; and a temporary, preliminary, and permanent injunction enjoining the imposition and enforcement of the tax against plaintiff.

¶ 15    Count IV of the complaint alleged that the Tax Ordinance violated the uniformity clause of the Illinois Constitution because it drew a distinction between owners[1] of gambling devices and owners of video gaming terminals and charged them different tax amounts. Count IV alleged that the purpose of the tax was to provide funds to combat crime, health problems, and addiction related to gambling and that "[b]ased on this stated purpose of combating crime, health problems, and addi[c]tion that relate to gambling, the Defendant has no legitimate basis for drawing the distinction between Gambling Devices and Video Gaming Terminals for purposes of the Gambling Machine Tax." Count IV sought a declaration that the tax violated the uniformity clause of the Illinois Constitution; and a temporary, preliminary, and permanent injunction enjoining the imposition and enforcement of the tax against plaintiff.

¶ 16    Attached to plaintiff's complaint was a printout of an article purportedly from the County's website concerning the Tax Ordinance.[2] The article, which was dated October 30, 2012, and was authored by "Communications Staff," stated that County President Toni Preckwinkle "decided to create a tiered system, taking into consideration the potential daily revenue of machines and the impact they have on public health and safety in Cook County." The article quoted Preckwinkle as saying, " 'We plan to tax them a little more than one day's revenue,' " and further quoted her as saying, " 'It's a small price to pay to help with the impact on crime, health and addiction. And we've reduced the impact on smaller mom and pop establishments.' " The article indicated that "[t]he additional revenue generated by this tax will help the County invest in public safety and criminal justice services to combat the negative impacts of compulsive gambling and other gambling addictions."

¶ 17                              III. Motions for Summary Judgment

¶ 18    On May 23, 2014, both parties filed motions for summary judgment. Plaintiff's motion for summary judgment argued that (1) the Riverboat Gambling Act expressly forbade taxes such as those enacted by the County; (2) the Illinois Constitution limited the authority of home rule units to matters "pertaining to [their] government and affairs," and casino gambling was not such a matter; (3) the tax was an impermissible occupation tax and an impermissible license for revenue, both of which were prohibited by the Illinois Constitution; and (4) the tax violated the uniformity clause of the Illinois Constitution.

¶ 19    The County's motion for summary judgment argued that (1) the General Assembly had not preempted the County from taxing gambling machines, (2) the tax was authorized by section 5-1009 of the Counties Code (55 ILCS 5/5-1009 (West 2012)), (3) the tax was a valid tax and

---

[1]The parties and the trial court sometimes refer to the "operators" of Gambling Devices and Video Gaming Terminals in discussing the tax. However, it is actually the owner of the Gambling Device or Video Gaming Terminal who is required to pay the tax. Cook County Ordinance No. 12-O-62, § 74-628(a), (b) (approved Nov. 9, 2012). We use the correct term throughout this opinion.

[2] The article is still available on the County's website. *President Preckwinkle Announces Adjustment to Proposed Tax on Gambling Machines*, Cook County Government, http://www. cookcountyil.gov/2012/10/30/president-preckwinkle-announces-adjustment-to-proposed-tax-on-gamb ling-machines/ (last visited July 21, 2015).

was not an improper attempt to raise revenue by exercise of the County's police power, and (4) the tax did not violate the uniformity clause of the Illinois Constitution.

¶ 20 Attached to plaintiff's motion for summary judgment were several exhibits explaining the extent of the Gaming Board's involvement with plaintiff's operation of Rivers Casino. One such exhibit was a copy of the Illinois Gaming Board's 2013 annual report. The report stated that the Gaming Board "administer[ed] a regulatory and tax collection system for casino and video gambling in Illinois," and also had "comprehensive law enforcement responsibilities associated with casino and video gambling operations in Illinois." The report explained that the Gaming Board's staff "conduct[ed] audit, legal, enforcement, investigative, operational and financial analysis activities to ensure the integrity of riverboat and video gambling in Illinois" as mandated by the Riverboat Gambling Act and the Video Gaming Act. The Gaming Board "ensure[d] the integrity of the gambling operations through the regulatory oversight and the licensing of gaming operations and personnel." The Gaming Board also conducted criminal background checks and financial investigations of riverboat and video gaming personnel to ensure that they had no felony convictions or criminal history that would make them ineligible for licensure.

¶ 21 The report indicated that the Riverboat Gambling Act imposed two taxes on casinos: a casino admissions tax and a casino privilege or wagering tax. The admissions tax was a flat fee of $3 per person, while the wagering tax was set as a percentage of the casino's adjusted gross receipts. Revenues from the two taxes were deposited into the State Gaming Fund, a special fund in the state treasury. Of the $3 admission tax imposed per person, $1 went to the host community where the casino was located. The remainder of the admission tax, as well as revenues from the wagering tax, went to the Education Assistance Fund, a general fund which can be used for any purpose relating to public education; to the hosting local government; and for the Gaming Board's administrative and operational expenses. Additionally, a specified percentage of Rivers Casino's revenue was paid to the Horse Racing Equity Fund and another percentage was designated to the Cook County criminal justice system. According to the report, Rivers Casino paid approximately $161.6 million in its "State share of taxes" and approximately $24.7 million in its "Local share of taxes" in 2013.

¶ 22 The report stated that in 2002, the Gaming Board adopted a voluntary self-exclusion program for problem gamblers, in order "to help compulsive gamblers regain control of their lives by giving those persons the ability to ban themselves from Illinois casinos."

¶ 23 Also attached to plaintiff's motion for summary judgment was the affidavit of Stephanie Budnyk, plaintiff's regulatory compliance manager, who was responsible for ensuring compliance with all federal and state rules and regulations. She was responsible for writing Rivers Casino's internal controls and submitting those internal controls to the federal and state authorities, and worked "extremely closely" with the Gaming Board to determine whether any proposed changes to the internal controls satisfied the requirements of the state's applicable rules and regulations.

¶ 24 Stephanie Budnyk's affidavit stated that the Gaming Board conducted background checks on every Rivers Casino employee, and that Rivers Casino was responsible for ensuring at all times that its employees have met the background requirements established by the Gaming Board. Rivers Casino worked with the Gaming Board on an ongoing basis "to develop and maintain a comprehensive series of internal controls to ensure the proper operations within the casino and integrity of the gaming process as a whole. Rivers Casino develops and proposes

these internal controls which are then subject to the review and approval of the [Gaming Board]." The internal controls "cover every aspect of casino operations from accounting to floor operations to security to personnel matters and every aspect in between"; Stephanie Budnyk indicated that the internal controls were comprised of 17 sections with 270 subparts, with each subpart running as many as 80 pages, and that "[e]very word and page is reviewed and approved by" the Gaming Board.

¶ 25        Pursuant to the internal controls, at least one employee of the Gaming Board was required to be physically located at Rivers Casino at all times. Any vendor of gaming equipment or supplies was required to be reviewed and approved by the Gaming Board before it could sell to plaintiff, and all other vendors were also required to be vetted to satisfy the Gaming Board's regulations. The internal controls also established the process by which any gambling device could be displayed and used at Rivers Casino for licensed gambling.

¶ 26        Stephanie Budnyk's affidavit indicated that the Riverboat Gambling Act addressed the issue of problem gambling and that "Rivers Casino works closely with the [Gaming Board] on these matters and devotes considerable time and resources to ensure that compulsive gambling issues are addressed and supported."

¶ 27        Also attached to plaintiff's motion for summary judgment was the affidavit of John Budnyk, the director of surveillance for Rivers Casino, who "work[ed] closely with the Illinois Gaming Board to ensure that the casino is in full cooperation with the Illinois Rules and Regulations applicable to matters involving security and surveillance" and also worked with the Gaming Board "on any investigations or other security matters relating to the casino operations." Consistent with its authority under the Riverboat Gambling Act, the Gaming Board had established offices at Rivers Casino and Gaming Board agents, consisting of both members of the Gaming Board and the Illinois State Police, maintained a staff of 15 to 20 officers, "providing security and oversight at all times that Rivers Casino is in operation"; Rivers Casino was "not permitted to operate unless these designated agents of the [Gaming Board] are on duty on the premises of the casino."

¶ 28        To the extent that any other law enforcement agency sought access to Rivers Casino, "they may do so only with the permission of the [Gaming Board]." Similarly, "any security matters involving physical altercations or other misconduct within the casino or the bars and restaurants and other facilities adjacent to the casino floor[ ] are addressed by the [Gaming Board] rather than local law enforcement." Rivers Casino, with the instruction and approval of the Gaming Board, had established a "secure room" outside of the casino floor for the purpose of safely detaining any person suspected of illegal activity, who "would be detained under the authority of the [Gaming Board] and may be transferred to the custody of the Des Plaines Police Department or other local law enforcement from that secure location."

¶ 29        Also attached to plaintiff's motion for summary judgment was the affidavit of Albert Geldres, vice president of slot operations for Rivers Casino, who was responsible for "oversee[ing] the day-to-day operations of all of [the] electronic games at the casino," which included "the profits and losses for the slot machine department, capital planning and deployment, staffing and leadership development, and all service initiatives for the slot department and Rush Rewards players club at Rivers Casino."

¶ 30        Geldres' affidavit stated that he worked closely with the Gaming Board in connection with its oversight of the electronic gaming activities at the casino. Every slot machine was required to be inspected and approved by the Gaming Board before it could enter the casino's premises,

with a Gaming Board inspector "meet[ing] the common carrier delivering any slot machine to Rivers Casino at the loading dock outside of the casino." Geldres indicated that "[o]nly after conducting a comprehensive investigation of the slot machine and the integrity of its internal functions[ ] may the [Gaming Board] agent approve the slot machine for gambling purposes. The [Gaming Board] agent certifies his approval by affixing an approved seal to the outside of the machine. This is the only government or regulatory seal or decal which may be affixed to the outside of the machine."

¶ 31 Geldres' affidavit stated that Rivers Casino management frequently moved slot machines from one location to another on the casino floor, often more than 25 times a week, but could move the machines only after receiving the consent of the Gaming Board, which reviewed the software on each machine to ensure that it was functioning properly. Similarly, if Rivers Casino management wished to move slot machines from the warehouse and to remove others for regular maintenance, it could do so only after obtaining the permission of the Gaming Board to move the machines "and the entire process must be overseen by [Gaming Board] personnel." "The machines are met by [Gaming Board] personnel and inspected upon leaving the warehouse and entering the Rivers Casino facility."

¶ 32                                IV. Trial Court Ruling

¶ 33 On August 27, 2014, the trial court issued a written opinion granting plaintiff's motion for summary judgment, denying the County's motion for summary judgment, and granting a permanent injunction "enjoining the imposition and enforcement of the Gambling Machine Tax." The court noted that there were four issues presented for its resolution: "(1) whether the [Riverboat Gambling Act] expressly forbids taxes such as those enacted by the County; (2) whether the County's Tax constitutes a tax on occupations prohibited under the Illinois Constitution; (3) whether the Tax constitutes a license for revenue prohibited under the Illinois Constitution; and (4) whether the Tax violates the uniformity clause of the Illinois Constitution." The court further noted that while both parties discussed the issue of whether the Illinois Constitution "limits the authority of home rule units to matters 'pertaining to its government and affairs,' " it would not discuss the issue because "[t]his issue has no relation to any of the Counts alleged in Plaintiff's Verified Complaint for Injunctive Relief and for Declaratory Judgment."

¶ 34 With respect to count I, the trial court considered whether the Riverboat Gambling Act created exclusive jurisdiction for the Gaming Board such that the Tax Ordinance improperly interfered with that exclusive jurisdiction. The court found that the Riverboat Gambling Act "includes an explicit provision barring additional taxes other than those established by the Act" and that this prohibition applied to home rule units notwithstanding the fact that the Riverboat Gambling Act did not specifically refer to home rule units; the court noted that "[t]he argument that 'any political subdivision thereof' does not specifically include home rule units is disingenuous. While the [Riverboat Gambling Act] may not spell out home rule unit, it clearly specifies that all subdivisions of the State of Illinois are prohibited from imposing an enumerated list of taxes on [Riverboat Gambling Act] licensees, including home rule units." The court also rejected the County's argument that the express preemption of taxes did not apply to home rule units because the Riverboat Gambling Act was not passed with a three-fifths supermajority. The court noted that the Illinois Constitution provided that the General Assembly could limit or deny "the power to tax and any other power or function of a

- 8 -

home rule unit not exercised or performed by the State other than a power or function specified in subsection (*l*) of this section" through a law passed by three-fifths of the members elected to each house. Ill. Const. 1970, art. VII, § 6(g). However, the court further noted that "[t]he power to tax licensed casino gambling is exclusively exercised and performed by the State." Accordingly, the court found that "the [Riverboat Gambling Act] need not be passed by a supermajority to prohibit subdivisions of the State of Illinois from taxing licensed casino gambling" and granted plaintiff's motion for summary judgment on count I of its complaint.

¶ 35    With respect to count II, the trial court considered whether the tax was an occupation tax prohibited by the Illinois Constitution. The court rejected the County's argument that the tax was authorized through the enactment of section 5-1009 of the Counties Code, which prohibited "a retailer's occupation tax, service occupation tax, use tax, sales tax or other tax on the use, sale or purchase of tangible personal property based on the gross receipts from such sales or the selling or purchase price of said tangible personal property," but permitted "other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." 55 ILCS 5/5-1009 (West 2012). The court found that the phrase "on the use, sale or purchase of tangible personal property based on the gross receipts from such sales or the selling or purchase price of said tangible personal property" modified "other tax" and not the retailer's occupation tax, service occupation tax, use tax and sales tax. The court thus concluded that section 5-1009 "allows for taxes, other than retailer's occupation taxes, service occupation taxes, use taxes, and sales taxes, that are 'not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property.' "

¶ 36    The court further rejected the County's argument that the tax at issue was not a tax on gross receipts, income, or earnings, finding that the argument ignored the plain language of the constitution, which limited a home rule unit's power to those the General Assembly may provide by law "to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII, § 6(e). The court found that "[t]he phrase 'or upon occupations' clearly comes after, and is completely separate from, 'taxes upon or measured by income or earnings.' Therefore, whether a tax is imposed upon or measured by income or earnings has no bearing on whether it is an impermissible occupation tax. An occupation tax is separate and apart from 'taxes upon or measured by income or earnings' just as 'license for revenue' is a separate limit." The court found that the County's interpretation "would make the phrase 'or upon occupations' useless and meaningless, as the County argues that an occupation tax is one that is 'upon or measured by income or earnings.' "

¶ 37    The court also rejected the County's argument that any services plaintiff provided were incidental to the gambling machines and therefore, services were not being taxed. The court noted that even if it was to accept the County's argument, "the service of licensed gambling is so deeply interconnected with the slot machine itself that it cannot be deemed incidental." The court agreed with plaintiff's argument that "because the tax falls upon the license holder rather than the purchaser of the service, and because it is not imposed on the sale of goods," the tax was more likely to be considered an impermissible occupation tax. The court found that "[i]t is clear that the County's Tax on slot machines and video gaming terminals is a tax explicitly designed to impose, and does impose, a tax on a single occupation: licensed gambling. The tax is imposed directly upon the providers of these services. Therefore, the Gambling Machine Tax Ordinance constitutes an impermissible tax on occupations prohibited by the Illinois

Constitution." Accordingly, the court granted plaintiff's motion for summary judgment on count II of its complaint.

¶ 38    With respect to count III, the court considered whether the tax was a "license for revenue" prohibited by the Illinois Constitution. The court found that the tax "has all the indicia of a license for revenue," pointing to the fact that the tax was imposed on the holders of gaming licenses who own gambling machines and requires those engaged in displaying the machines to the public to (1) register their gambling machines, (2) conspicuously affix the emblem issued by the County to each gambling device, (3) label each gambling machine with the name, address, and telephone number of the person displaying the gambling machine for play or operation by the public, (4) be subject to penalties if they display a gambling machine without the emblem, (5) maintain accurate and complete documents, books, and records of each transaction or activity subject to the tax, and (6) make their premises available for inspection, audit, and copying to the County. Accordingly, the court found the tax to be an illegal license for revenue and granted plaintiff's motion for summary judgment on count III of its complaint.

¶ 39    Finally, with respect to count IV, the trial court considered whether the distinction between owners of gambling devices and owners of video gaming terminals violated the uniformity clause of the Illinois Constitution. The court noted that in order to survive a challenge under the uniformity clause, a nonproperty tax classification must be based on a real and substantial difference between the people taxed and those not taxed and must bear some reasonable relationship to the object of the legislation or to public policy. The court indicated that plaintiff had identified two categories of taxpayers: owners of gaming devices, who were subject to a $1,000 tax; and owners of video gaming terminals, who were subject to a $200 tax. The court further indicated that the County had set forth several arguments as to why there was a real and substantial difference between the two categories, including that gambling devices were generally located in casinos while video gaming terminals were generally found in establishments such as bars and restaurants; that each gambling device averaged over $800 per day while the potential daily revenue of a video gaming terminal was approximately $200; that over a thousand gambling devices were centralized in one location with access to high limit machines while smaller establishments containing video gaming terminals were limited to one to five terminals per establishment; and that gambling on video gaming terminals at locations such as bars and restaurants was merely incidental to the primary purpose of eating, drinking, or socializing at those locations.

¶ 40    The court found that "these justifications [did not] pass muster. First, the Court notes that Defendants provide no support for their assertion that the potential daily revenue of a Video Gaming Terminal was about $200.00. Defendants simply cite to an internet printout from 2012 that does not mention the $200.00 figure, much less explain or provide any authority for how they obtained it. Further, the Court does not find any support for the assertion that Video Gaming Terminals are generally found in establishments such as bars and restaurants. Defendants merely state that it is so and expect the Court to take that as evidence. Finally, the Court notes that being regulated through two separate and distinct statutes does not, by itself, justify a classification under the uniformity clause." Accordingly, the trial court found that "[d]efendants, the taxing body, have failed to provide a real and substantial difference between Video Gaming Terminals and Gambling Devices to justify their classification under the Ordinance."

¶ 41　　The court then considered whether taxing the two types of machines differently furthered the goal of combating crime, health problems, and addictions related to gambling. The court indicated that the County had argued that the purpose of the tax was to generate revenue to help offset the increased costs incurred by the County as a result of the pathological gamblers and other gambling addicts who used the machines, and that it was logical to presume that casinos were more likely to attract pathological gamblers and gambling addicts since they offered more gaming opportunities to win and to play for higher stakes. The County further argued that gambling in bars and restaurants was limited to a handful of video gaming terminals and was secondary to the primary purpose of being at the location eating and drinking. The County argued that "it is appropriate that casinos with Gambling Devices absorb more of the costs to help Cook County invest in public safety and criminal justice services to combat the negative impacts of compulsive gambling and other gambling addictions."

¶ 42　　The court rejected the County's argument, noting that its "vital flaw" was that "[t]here is nothing that prohibits Video Gaming Terminals at casinos. Nor have Defendants provided evidence that Video Gaming Terminals are only used at bars and restaurants or that they are predominantly used in bars and restaurants." Thus, the court found that the County's "alleged relationship between the classification and the object of the legislation or public policy fails." The court concluded that the County had failed to produce a justification for classifying video gaming terminals and gambling devices differently and, accordingly, granted plaintiff's motion for summary judgment on count IV of its complaint.

¶ 43　　On September 3, 2014, the County filed a motion for clarification, asking whether the permanent injunction granted by the trial court applied solely to plaintiff or also to other parties subject to the tax. On September 10, 2014, the court entered an order finding:

> "No clarification of the Order and Opinion is necessary as it speaks for itself. To the degree there is a question, the order is dispositive, '[a] permanent injunction is granted enjoining the imposition and enforcement of the Gambling Machine Tax.' This Order prohibits the imposition and enforcement of the Gambling Machine Tax in its entirety, on any and all possible tax payers in any and all situations."

This appeal follows.

¶ 44　　　　　　　　　　　　　ANALYSIS

¶ 45　　On appeal, the County argues that the trial court erred in denying its motion for summary judgment and in granting plaintiff's motion for summary judgment and finding that the Tax Ordinance (1) was preempted by the Riverboat Gambling Act, (2) constituted an impermissible tax on occupations pursuant to the Illinois Constitution, (3) constituted an impermissible license for revenue pursuant to the Illinois Constitution, and (4) violated the uniformity clause of the Illinois Constitution.

¶ 46　　A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.

2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 47 "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). However, "[w]hen, as in this case, parties file cross-motions for summary judgment, they concede the absence of a genuine issue of material fact and invite the court to decide the questions presented as a matter of law." *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005) (citing *Continental Casualty Co. v. Law Offices of Melvin James Kaplan*, 345 Ill. App. 3d 34, 37-38 (2003)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 48                    I. Preemption by Riverboat Gambling Act

¶ 49 The County first argues that the trial court erred in finding that the Tax Ordinance was preempted by the Riverboat Gambling Act. The trial court's conclusion was based on its interpreting the Riverboat Gambling Act to restrict home rule units such as the County from taxing except as provided in the Riverboat Gambling Act, as well as its determination that the Illinois Constitution did not require the Riverboat Gambling Act to be passed by a three-fifths supermajority. We begin our analysis with a brief overview of the Riverboat Gambling Act.

¶ 50                         A. Riverboat Gambling Act

¶ 51 The Riverboat Gambling Act was enacted in 1990 "to benefit the people of the State of Illinois by assisting economic development and promoting Illinois tourism and by increasing the amount of revenues available to the State to assist and support education." 230 ILCS 10/2(a) (West 2012). However, the General Assembly recognized that "[w]hile authorization of riverboat gambling will enhance investment, development and tourism in Illinois, it is recognized that it will do so successfully only if public confidence and trust in the credibility and integrity of the gambling operations and the regulatory process is maintained. Therefore, regulatory provisions of this Act are designed to strictly regulate the facilities, persons, associations and practices related to gambling operations pursuant to the police powers of the State, including comprehensive law enforcement supervision." 230 ILCS 10/2(b) (West 2012).

¶ 52 The Riverboat Gambling Act established the Gaming Board, which had "the powers and duties specified in this Act, and all other powers necessary and proper to fully and effectively execute this Act for the purpose of administering, regulating, and enforcing the system of riverboat gambling established by this Act." 230 ILCS 10/5(a)(1) (West 2012). The Riverboat

Gambling Act further provided that the Gaming Board "shall have jurisdiction over and shall supervise all gambling operations governed by this Act." 230 ILCS 10/5(c) (West 2012). This jurisdiction "shall extend under this Act to every person, association, corporation, partnership and trust involved in riverboat gambling operations in the State of Illinois." 230 ILCS 10/5(a)(1) (West 2012). The Gaming Board's powers included the power "[t]o promulgate rules and regulations for the purpose of administering the provisions of this Act and to prescribe rules, regulations and conditions under which all riverboat gambling in the State shall be conducted. Such rules and regulations are to provide for the prevention of practices detrimental to the public interest and for the best interests of riverboat gambling, including rules and regulations regarding the inspection of such riverboats and the review of any permits or licenses necessary to operate a riverboat under any laws or regulations applicable to riverboats, and to impose penalties for violations thereof." 230 ILCS 10/5(c)(3) (West 2012).

¶ 53    Under the Riverboat Gambling Act, each casino owner was required to post at every entrance and exit and near every credit location "signs with a statement regarding obtaining assistance with gambling problems," the language of which would be determined by the Department of Human Services. 230 ILCS 10/13.1(a) (West 2012). The statement was also to be printed "on all paper stock that the licensed owner provides to the general public." 230 ILCS 10/13.1(b) (West 2012).

¶ 54    The Riverboat Gambling Act included a section entitled, "Limitation on taxation of licensees," which is central to plaintiff's argument concerning preemption. This section provides, in full:

> "Limitation on taxation of licensees. Licensees shall not be subjected to any excise tax, license tax, permit tax, privilege tax, occupation tax or excursion tax which is imposed exclusively upon the licensee by the State or any political subdivision thereof, except as provided in this Act." 230 ILCS 10/21 (West 2012).

¶ 55                                    B. Express Preemption

¶ 56    The County first argues that the trial court erred in interpreting section 21 of the Riverboat Gambling Act to preempt taxation by home rule units such as the County. Under the Illinois Constitution, except as limited by article VII, section 6, of the constitution, a home rule unit such as the County "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a). "Section 6(a) was written with the intention to give home rule units the broadest powers possible." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 30 (citing *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992)). Furthermore, the constitution expressly provides that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 57    However, the General Assembly "may *** preempt the exercise of a municipality's home rule powers by expressly limiting that authority." *Palm*, 2013 IL 110505, ¶ 31 (citing *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 287 (2001)). Under article VII, section 6(h), "[t]he General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit other than a taxing power." Ill. Const. 1970, art. VII, § 6(h). With respect to the power to tax, "[t]he General Assembly by a law approved by the vote of three-fifths of the members elected to each house may deny or

- 13 -

limit the power to tax and any other power or function of a home rule unit not exercised or performed by the State." Ill. Const. 1970, art. VII, § 6(g).

¶ 58    "If the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect." *Palm*, 2013 IL 110505, ¶ 31 (citing *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 108 (1981)). If the legislature does not do so, article VII, section 6(i) provides that "[h]ome rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i).

¶ 59    The General Assembly has codified the principle that "[t]o restrict the concurrent exercise of home rule power, the General Assembly must enact a law *specifically* stating home rule authority is limited" through section 7 of the Statute on Statutes. (Emphasis in original.) *Palm*, 2013 IL 110505, ¶ 32 (citing 5 ILCS 70/7 (West 2010)). Under the Statute on Statutes, the General Assembly has provided that "[n]o law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2012). Section 7 of the Statute on Statutes "has been formally adopted as part of [the supreme] court's home rule jurisprudence." *Palm*, 2013 IL 110505, ¶ 32 (citing *Schillerstrom Homes*, 198 Ill. 2d at 287).

¶ 60    Our supreme court has "consistently recognized that the home rule provisions of the Illinois Constitution are intended to eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intention." (Internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "The Illinois approach places almost exclusive reliance on the legislature rather than the courts to keep home rule units in line." (Internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "[I]f the constitutional design is to be respected, the courts should step in to compensate for legislative inaction or oversight only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies." (Emphasis and internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "[B]ecause the legislature can always vindicate state interests by express preemption, only vital state interests would allow a court to decide that an exercise of home rule power does not pertain to local government and affairs." *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 22. "Accordingly, '[i]f a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power.' " *Palm*, 2013 IL 110505, ¶ 36 (quoting *StubHub*, 2011 IL 111127, ¶ 22 n.2).

¶ 61    In the case at bar, the County argues that the Tax Ordinance pertained to local government and affairs and further argues that the legislature did not expressly preempt home rule through the Riverboat Gambling Act. We agree.

¶ 62    First, we agree with the County that the tax pertains to the local government and affairs of the County, as it is a tax imposed by the County on the owners of gambling machines "displayed by a person for play or operation by the public in Cook County." Cook County Ordinance No. 12-O-62, § 74-628(a), (b) (approved Nov. 9, 2012). Plaintiff does not argue that the tax has an extraterritorial effect such that it attempts to tax behavior outside the boundaries

of the County. Instead, plaintiff's argument is that "[l]icensed casino gambling is a matter of statewide concern and is therefore outside the jurisdiction of home rule authority." We do not find this argument persuasive.

¶ 63      We find our supreme court's decision in *Town of Cicero v. Fox Valley Trotting Club, Inc.*, 65 Ill. 2d 10 (1976), to be instructive to our analysis of the issue before us. In that case, the town of Cicero imposed an amusement tax, which the defendants, corporations engaged in the business of horse racing at a Cicero racetrack, argued was invalid in part because the State had preempted the field of horse racing, thereby precluding any local legislation in that area. *Town of Cicero*, 65 Ill. 2d at 16. The supreme court recognized that the legislature had enacted a " 'comprehensive statutory plan for the regulation of the horse racing industry in Illinois' " (*Town of Cicero*, 65 Ill. 2d at 16 (quoting *People ex rel. Scott v. Illinois Racing Board*, 54 Ill. 2d 569, 577 (1973))), but pointed out that "[t]he power to regulate and the power to tax are separate and distinct powers" (*Town of Cicero*, 65 Ill. 2d at 17). Furthermore, the court noted that "[e]ven if we assume, *arguendo*, that the existence of a comprehensive statutory regulatory scheme may serve, in a given instance, to preclude local regulatory efforts, it does not necessarily follow that the power to tax in that area would also be preempted." *Town of Cicero*, 65 Ill. 2d at 17. Similarly, the defendants' argument that the horse racing industry was statewide in nature was also unpersuasive to the supreme court, with the court noting:

> "[D]efendants insist that horse racing is not an activity pertaining to Cicero's government and affairs. We disagree. Defendants ignore horse racing's hybrid character as both an industry and an amusement. While horse racing is an industry heavily regulated by the State, it is likewise, in the context of this case, a local amusement being carried on within the corporate boundaries of Cicero. As previously stated, this case does not involve any exercise of a home rule unit's regulatory powers. We are confronted here solely with a taxing measure and, in that framework, we see no merit to defendants' contention." *Town of Cicero*, 65 Ill. 2d at 19-20.

¶ 64      In the case at bar, similarly, we are presented with a taxing measure that seeks to tax gambling machines displayed for use within the boundaries of the County. Our supreme court has recognized that "[t]he framers of the 1970 Constitution considered the power to tax as essential to effective home rule and intended that power to be broad." *Mulligan v. Dunne*, 61 Ill. 2d 544, 548 (1975). Here, we cannot agree with plaintiff that such a tax does not pertain to the County's local government and affairs.

¶ 65      We find plaintiff's reliance on our supreme court's decision in *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, to be unpersuasive. In that case, the City of Chicago (City) amended its amusement tax ordinance to require " 'reseller's agents' " to collect and remit the amusement tax. *StubHub*, 2011 IL 111127, ¶ 8. StubHub, which was considered a reseller's agent under the ordinance, argued that the City lacked the authority to impose such a requirement. *StubHub*, 2011 IL 111127, ¶ 17. Our supreme court determined that the State had a greater interest than the City in addressing the problem of tax collection by Internet auctioneers and concluded that the City's ordinance did not pertain to its own government and affairs. *StubHub*, 2011 IL 111127, ¶ 36.

¶ 66      We cannot find that *StubHub* provides any support to plaintiff's argument that the tax in the instant case does not pertain to the County's local government and affairs. Plaintiff contends that "[s]ignificantly, the Illinois Supreme Court in *StubHub* concluded that a tax by itself, without more, was enough to interfere with the state's regulation of a particular industry, ticket

- 15 -

resellers, to render the tax unconstitutional under Section 6(a)." While this would certainly be instructive to our analysis if true, this is not an accurate statement of our supreme court's holding in *StubHub*. The court specifically noted in its analysis that the City devoted considerable space in its briefs to defending its amusement tax ordinance as applied to ticket resales, "[b]ut the City has home rule authority to tax [citation], and statutory authority to tax amusements [citation]. Thus, the problem is not the tax, but its collection by internet auction listing services, whose users created a new market in online ticket resales." *StubHub*, 2011 IL 111127, ¶ 26. Later, the court again noted that "[a]s the federal trial court correctly noted, 'There is no doubt that the City has the authority to impose a tax on the venues that sell tickets to amusements.' [Citation.] Additionally, 'the parties do not dispute the fact that if a person sells a ticket for more than face value within the jurisdiction of the City of Chicago, he or she is required to pay the City's 8% amusement tax.' [Citation.] The question posed by the federal appeals court here does not address the City's authority to tax ticket resales, but rather the City's authority to impose an obligation on internet auction listing services to collect this tax." *StubHub*, 2011 IL 111127, ¶ 38. Thus, the supreme court made it perfectly clear that the tax itself was not at issue but only the regulatory ordinance requiring agents such as StubHub to collect and remit the tax. Here, by contrast, it is the tax itself at issue, and not any regulatory ordinance. Accordingly, *StubHub* does not provide any guidance in this area. See also *Chicago Park District v. City of Chicago*, 111 Ill. 2d 7, 13 (1986) (in discussing an earlier case, noting that "[t]he tax in [*Board of Education of School District No. 150 v. City of Peoria*, 76 Ill. 2d 469 (1979),] was not considered impermissible; the court held simply that burdening the school system with the *collection* of the tax was unconstitutional because it amounted to *regulation* of the statewide school system" (emphases in original)).

¶ 67        Similarly, the other cases plaintiff relies on involve either regulatory ordinances or taxes that have an extraterritorial effect, meaning that they extended beyond the home rule unit's local affairs. For instance, the ordinance at issue in *Peoples Gas Light & Coke Co. v. City of Chicago*, 125 Ill. App. 3d 95, 96 (1984), was a regulatory ordinance imposing "a blanket prohibition against termination of gas service by Peoples Gas to any residential consumers or master metered residential buildings in Chicago during the months of November through March inclusive." Likewise, the ordinance at issue in *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 538 (1975), imposed a $2 fee on the filing of pleadings in all civil cases, a fee, which our supreme court in a later case noted, that "would affect and regulate, in a sense, the statewide constitutionally provided judicial system." *Chicago Park District v. City of Chicago*, 111 Ill. 2d 7, 12 (1986) (affirming the imposition of a mooring tax). See also *People ex rel. Lignoul v. City of Chicago*, 67 Ill. 2d 480, 482 (1977) (ordinance at issue was a regulatory ordinance "permit[ting] both State and federally chartered banks to perform banking functions at certain facilities and electronic banking machines in community offices located away from the main office of the bank"); *Commonwealth Edison Co. v. City of Warrenville*, 288 Ill. App. 3d 373 (1997) (city zoning regulation required permits for construction of transmission line for public utility); *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d 399, 403 (1993) (ordinance at issue was a "toll" on fiber optic cables running across the state and through various municipalities); *City of Highland Park v. County of Cook*, 37 Ill. App. 3d 15 (1975) (ordinance at issue required city approval before the county could construct, alter, or maintain a highway within its corporate limits). Accordingly, we do not find plaintiff's reliance on these cases to be persuasive. Instead, we agree with the County that the tax imposed

- 16 -

under the Tax Ordinance pertains to the County's local government and affairs. Consequently, unless it has been preempted by the General Assembly, the County has the authority to impose the tax.[3]

¶ 68    As noted, the section that plaintiff claims preempts the Tax Ordinance is section 21 of the Riverboat Gambling Act, which is entitled "Limitation on taxation of licensees" and provides, in full:

"Limitation on taxation of licensees. Licensees shall not be subjected to any excise tax, license tax, permit tax, privilege tax, occupation tax or excursion tax which is imposed exclusively upon the licensee by the State or any political subdivision thereof, except as provided in this Act." 230 ILCS 10/21 (West 2012).

¶ 69    The General Assembly "may *** preempt the exercise of a municipality's home rule powers by expressly limiting that authority." *Palm*, 2013 IL 110505, ¶ 31 (citing *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 287 (2001)). Under article VII, section 6(h), "[t]he General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit other than a taxing power." Ill. Const. 1970, art. VII, § 6(h). With respect to the power to tax, "[t]he General Assembly by a law approved by the vote of three-fifths of the members elected to each house may deny or limit the power to tax and any other power or function of a home rule unit not exercised or performed by the State." Ill. Const. 1970, art. VII, § 6(g). "If the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect." *Palm*, 2013 IL 110505, ¶ 31 (citing *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 108 (1981)).

¶ 70    In the case at bar, plaintiff argues, and the trial court agreed, that the General Assembly preempted the County's taxation of gambling machines through section 21 of the Riverboat Gambling Act, which prohibits taxation by "the State or any political subdivision thereof," except as provided in the Riverboat Gambling Act. 230 ILCS 10/21 (West 2012). We do not find this argument persuasive.

¶ 71    The trial court found that "[t]he argument that 'any political subdivision thereof' does not specifically include home rule units is disingenuous. While the [Riverboat Gambling Act] may not spell out home rule unit, it clearly specifies that all subdivisions of the State of Illinois are prohibited from imposing an enumerated list of taxes on *** licensees, including home rule units." While we agree that the term "any political subdivision" can be interpreted to include home rule units in certain contexts, here, the language of the statute, quite simply, is not specific enough for us to reach that conclusion. We note that neither plaintiff, nor the trial court below, provided any authority for the conclusion that through using the term "any political subdivision," the General Assembly "clear[ly] intended to include 'home rule units' within this broad prohibition."

¶ 72    Our constitution requires specificity when denying a home rule unit the use of its powers. *Palm*, 2013 IL 110505, ¶ 31; see also *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 138 (1994) ("In order to meet the requirements of section 6(h), legislation must contain express language that the area covered by the legislation is to be exclusively controlled by the State."); *Mulligan v. Dunne*, 61 Ill. 2d 544, 550 (1975) ("a statute which purports to restrict home-rule powers must be specific"); *City of Chicago v. Roman*, 184

---

[3]We consider plaintiff's other challenges to the Tax Ordinance in subsequent sections of this opinion.

Ill. 2d 504, 520 (1998) (no preemption where "the Corrections Code, although quite comprehensive, does not expressly limit the concurrent exercise of the City's home rule power or require such exercise to conform to or be consistent with the Code"). The legislature has codified this principle through section 7 of the Statute on Statutes (*Palm*, 2013 IL 110505, ¶ 32), which, as noted, provides that "[n]o law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2012). There can be no dispute that section 21 of the Riverboat Gambling Act does not "specifically set[ ] forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2012).

¶ 73    Plaintiff characterizes section 7 as "simply a guideline for drafting legislation." However, section 7 of the Statute on Statutes "has been formally adopted as part of [the supreme] court's home rule jurisprudence." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 32 (citing *Schillerstrom Homes*, 198 Ill. 2d at 287). Our supreme court has noted that "[w]hen the General Assembly intends to preempt or exclude home rule units from exercising power over a matter, that body knows how to do so. In many statutes that touch on countless areas of our lives, the legislature has expressly stated that, pursuant to section 6(h) or 6(i), or both, of article VII of the Illinois Constitution, a statute is declared to be an exclusive exercise of power by the state and that such power shall not be exercised by home rule units." *City of Chicago v. Roman*, 184 Ill. 2d 504, 517 (1998) (citing statutes). One such example is within the Riverboat Gambling Act itself, in which, when setting forth the power of the Gaming Board, the statute provides that: "The establishment of the hours for sale and consumption of alcoholic liquor on board a riverboat is an exclusive power and function of the State. A home rule unit may not establish the hours for sale and consumption of alcoholic liquor on board a riverboat. This amendatory Act of 1991 is a denial and limitation of home rule powers and functions under subsection (h) of Section 6 of Article VII of the Illinois Constitution." 230 ILCS 10/5(c)(18) (West 2012). Plaintiff argues that the inclusion of express language in this section of the Riverboat Gambling Act offers "little if any guidance on the intent of the General Assembly at the time of the drafting of the Riverboat Gambling Act," since it was an amendment to the statute. Leaving aside the fact that the amendment was passed less than two years after the enactment of the Riverboat Gambling Act, plaintiff's argument is unpersuasive in light of the fact that section 7 of the Statute on Statutes had been effective for over a decade at the time of the passage of the Riverboat Gambling Act. Thus, it is apparent that the General Assembly clearly knew how to limit a home rule unit's power where it chose to do so and did not choose to include the operative language in section 21 of the Riverboat Gambling Act. Accordingly, the trial court erred when it found the Tax Ordinance was preempted by the Riverboat Gambling Act.

¶ 74                    C. Three-Fifths Supermajority Requirement
¶ 75    The County also argues that the trial court erred in finding that the legislature was not required to pass the Riverboat Gambling Act by a three-fifths supermajority in order to limit the County's power to tax. However, as we have concluded that the language of the Riverboat Gambling Act did not specifically limit the County's authority, we have no need to discuss this

portion of the court's conclusion.

¶ 76                                    II. Occupation Tax

¶ 77        The County next argues that the trial court erred in finding the tax to be an occupation tax prohibited by the Illinois Constitution. Under the Illinois Constitution, "[a] home rule unit shall have only the power that the General Assembly may provide by law *** (2) to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII, § 6(e). "[A]lthough section 6(e) permits taxes upon the sale or use of tangible items, the taxation of commercial services constitutes an 'occupation tax' which is prohibited unless sanctioned by the legislature." *Communications & Cable of Chicago, Inc. v. Department of Revenue*, 275 Ill. App. 3d 680, 685 (1995) (citing *Commercial National Bank v. City of Chicago*, 89 Ill. 2d 45 (1982)). The term "upon occupations" was not defined by the framers of the constitution. *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 565 (1974). However, our supreme court has stated that " 'an occupation tax has one of two missions: either to regulate and control a given business or occupation, or to impose a tax for the privilege of exercising, undertaking or operating a given occupation, trade or profession.' " *Town of Cicero*, 65 Ill. 2d at 23 (quoting *Reif v. Barrett*, 355 Ill. 104, 109 (1933)).

¶ 78        In the case at bar, the parties spend the majority of their time discussing whether the tax imposed by the Tax Ordinance is an occupation tax under the constitution. However, we have no need to resolve this dispute. As noted, the constitution provides that a home rule unit has "only the power that the General Assembly may provide by law" to impose an occupation tax. Ill. Const. 1970, art. VII, § 6(e). Here, even if the tax is considered to be an occupation tax, we agree with the County that it has been authorized by the General Assembly through section 5-1009 of the Counties Code.

¶ 79        Section 5-1009 provides:

> "Limitation on home rule powers. Except as provided in Section 5-1006, 5-1006.5, 5-1007 and 5-1008, on and after September 1, 1990, no home rule county has the authority to impose, pursuant to its home rule authority, a retailer's occupation tax, service occupation tax, use tax, sales tax or other tax on the use, sale or purchase of tangible personal property based on the gross receipts from such sales or the selling or purchase price of said tangible personal property. Notwithstanding the foregoing, this Section does not preempt any home rule imposed tax such as the following: (1) a tax on alcoholic beverages, whether based on gross receipts, volume sold or any other measurement; (2) a tax based on the number of units of cigarettes or tobacco products; (3) a tax, however measured, based on the use of a hotel or motel room or similar facility; (4) a tax, however measured, on the sale or transfer of real property; (5) a tax, however measured, on lease receipts; (6) a tax on food prepared for immediate consumption and on alcoholic beverages sold by a business which provides for on premise consumption of said food or alcoholic beverages; or (7) other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property. This Section does not preempt a home rule county from imposing a tax, however measured, on the use, for consideration, of a parking lot, garage, or other parking facility. This Section is a limitation, pursuant to subsection (g) of Section 6 of Article VII of the Illinois Constitution, on the power of home rule units to tax." 55 ILCS 5/5-1009 (West 2012).

- 19 -

¶ 80 The County argues that section 5-1009 permits a home rule unit to impose "other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property" under subsection (7). 55 ILCS 5/5-1009(7) (West 2012). Since the tax imposed by the Tax Ordinance is not based on the selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property, the County claims that the tax is therefore permitted under section 5-1009. We agree.

¶ 81 When interpreting statutes, our goal is to "ascertain and give effect to the true intent of the legislature." *In re Marriage of Kates*, 198 Ill. 2d 156, 163 (2001). " 'The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning.' " *Kates*, 198 Ill. 2d at 163 (quoting *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997)). When the plain language is unambiguous, the legislative intent discernible from the language must prevail and to resort to other interpretive aids is unnecessary. *Kates*, 198 Ill. 2d at 163. "Statutes should be read as a whole with all relevant parts considered, and they should be construed, if possible, so that no term is rendered superfluous or meaningless." *Kates*, 198 Ill. 2d at 163 (citing *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990), and *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16-17, 26 (1996)).

¶ 82 In the case at bar, section 5-1009 specifically provides that it "does not preempt any home rule imposed tax such as the following: *** (7) other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." 55 ILCS 5/5-1009 (West 2012). It is undisputed that the tax imposed by the Tax Ordinance is not based on the selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property. Accordingly, based on the plain language of section 5-1009, the tax is permitted under subsection (7).

¶ 83 Plaintiff argues that subsection (7) "permits a subset of taxes, provided they are not 'occupation taxes' which are expressly prohibited." Plaintiff claims that a court must first determine whether the tax is an occupation tax and then, only if it is not, the court then determines whether the tax is a valid exercise of home rule authority under subsection (7). We do not find this argument persuasive.

¶ 84 Plaintiff's argument overlooks the critical language prefacing the seven subsections listing taxes that are permitted: "Notwithstanding the foregoing, this Section does not preempt any home rule imposed tax such as the following ***." 55 ILCS 5/5-1009 (West 2012). "Notwithstanding" has been defined as meaning "[i]n spite of." American Heritage Dictionary 850 (2d coll. ed. 1982); see also *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 185 (1999) ("The word 'notwithstanding' has been defined as meaning 'in spite of.' " (quoting Webster's Third New International Dictionary 1545 (1986))); *Board of Education of Maine Township High School District No. 207 v. International Insurance Co.*, 344 Ill. App. 3d 106, 114 (2003); *Toner v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 259 Ill. App. 3d 67, 70 (1994). Thus, section 5-1009 permits taxation of the seven areas identified by the subsections *in spite of* the section's prohibition against certain taxes listed in the first sentence of the section. In other words, even if a tax fell within one of the areas prohibited under the first sentence of section 5-1009, it would still be permitted if it fell within one of the seven subsections set forth in the second sentence.

¶ 85 Curiously, the case plaintiff cites in support of its argument, *American Beverage Ass'n v. City of Chicago*, 404 Ill. App. 3d 682 (2010), actually supports the County's position rather than plaintiff's. In that case, the court considered whether a City of Chicago tax of five cents on

- 20 -

each bottle of water purchased at retail was permissible. *American Beverage Ass'n*, 404 Ill. App. 3d at 683. The plaintiffs' first argument was that the bottled water tax was an occupation tax that violated article VII, section 6(e) of the Illinois Constitution, and the appellate court found that the tax was not an occupation tax under the constitution. *American Beverage Ass'n*, 404 Ill. App. 3d at 687. The plaintiffs' next argument was that the City was statutorily prohibited from implementing the bottled water tax, an argument that the appellate court also found meritless. *American Beverage Ass'n*, 404 Ill. App. 3d at 688. Finally, the plaintiffs argued that section 8-11-6a of the Illinois Municipal Code (65 ILCS 5/8-11-6a (West 2008)) preempted the bottle water tax. *American Beverage Ass'n*, 404 Ill. App. 3d at 688. As this section of the Municipal Code is identical to section 5-1009 of the Counties Code in all material respects, it is this argument that is instructive in the instant case.

¶ 86        Like plaintiff in the instant case, the plaintiffs in *American Beverage Ass'n* argued that "section 8-11-6a preempts all retailer's occupation taxes, service occupation taxes, use taxes, and sales taxes (including the bottled water tax) regardless of how the tax is measured, but preempts any other tax only if those other taxes are measured by gross receipts or the selling or purchase price." *American Beverage Ass'n*, 404 Ill. App. 3d at 689. By contrast, like the County in the instant case, the City in *American Beverage Ass'n* argued that "only those retailer's occupation taxes, service occupation taxes, use taxes, and sales taxes that are measured by gross receipts or the selling or purchase price are preempted" and that "[s]ince the bottled water tax is not measured by gross receipts or the selling or purchase price," it was not preempted. *American Beverage Ass'n*, 404 Ill. App. 3d at 689-90. The court, however, found that it did not need to "delve into an extensive analysis of the first sentence of section 8-11-6a, because the second sentence clarifies the General Assembly's intent." *American Beverage Ass'n*, 404 Ill. App. 3d at 690.

¶ 87        The court then set forth the second sentence of section 8-11-6a which, as noted, is identical to the second sentence of section 5-1009 of the Counties Code, specifically focusing on subsection (7), which provided that section 8-11-6a did not preempt " 'other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property.' " (Emphasis omitted.) *American Beverage Ass'n*, 404 Ill. App. 3d at 690 (quoting 65 ILCS 5/8-11-6a (West 2008)). After setting forth this language, the court found:

> "Thus, exception (7) in the second sentence of section 8-11-6a makes clear that outside the six preceding exceptions, section 8-11-6a does not preempt taxes that are not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property. Exception (7) excepts the bottled water tax from preemption, as it is a flat tax of five cents per bottle and is not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." *American Beverage Ass'n*, 404 Ill. App. 3d at 690.

¶ 88        Plaintiff points to *American Beverage Ass'n* as supporting its assertion that "whether the tax was an occupation tax was the threshold consideration" and only after that determination did subsection (7) apply. However, that is clearly not what the *American Beverage Ass'n* court did. It is true that the court first discussed the plaintiff's constitutional occupation tax argument, determining that the tax was not an occupation tax. However, this determination had nothing to do with the court's analysis of section 8-11-6a of the Municipal Code. In discussing the Municipal Code, the court expressly stated that there was no need to consider the extent of the prohibition in the first sentence, because the second sentence "clarifie[d] the General

Assembly's intent." *American Beverage Ass'n*, 404 Ill. App. 3d at 690. The only question that needed to be resolved was whether the tax in that case fell within one of the exceptions set forth in the second sentence. Since it did, the court found that the tax was not preempted.

¶ 89 Likewise, in the case at bar, the only question we need to resolve is whether the tax imposed by the Tax Ordinance falls within one of the exceptions set forth in the second sentence of section 5-1009. Because the tax falls within subsection (7), it was permitted under section 5-1009. Accordingly, since it was authorized by the General Assembly, the County had the authority to impose the tax even if it was an occupation tax. See Ill. Const. 1970, art. VII, § 6(e) (home rule units have "only the power that the General Assembly may provide by law" to impose an occupation tax).

¶ 90 III. License for Revenue

¶ 91 The County next argues that the trial court erred in finding that the tax was an impermissible license for revenue. As noted, the Illinois Constitution provides that "[a] home rule unit shall have only the power that the General Assembly may provide by law *** (2) to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII, § 6(e). Our supreme court has explained that " '[t]he phrase "to license for revenue" describes those situations in which a governmental unit that did not have the power to tax attempted to raise revenue by the exercise of its police power.' " *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 576 (1974) (quoting *Rozner v. Korshak*, 55 Ill. 2d 430, 433 (1973)); see also *Forsberg v. City of Chicago*, 151 Ill. App. 3d 354, 365 (1986).

¶ 92 In the case at bar, the trial court found that the Tax Ordinance was a license for revenue because it had "all the indicia of a license for revenue," pointing to the fact that the tax was imposed on the holders of gaming licenses who own gambling machines and requires those engaged in displaying the machines to the public to (1) register their gambling machines, (2) conspicuously affix the emblem issued by the County to each gambling device, (3) label each gambling machine with the name, address, and telephone number of the person displaying the gambling machine for play or operation by the public, (4) be subject to penalties if they display a gambling machine without the emblem, (5) maintain accurate and complete documents, books, and records of each transaction or activity subject to the tax, and (6) make their premises available for inspection, audit, and copying to the County. Plaintiff essentially makes the same argument on appeal.

¶ 93 Our supreme court has considered whether ordinances imposed licenses for revenue in several cases. For instance, in *Rozner v. Korshak*, 55 Ill. 2d 430, 431 (1973), the plaintiff challenged the City of Chicago's wheel-tax ordinance, which "[made] it unlawful for any motor vehicle owner residing within the city to use the vehicle upon the public ways of the city unless it is licensed as provided in the ordinance" and alleged the tax was really a license for revenue. Our supreme court clarified that " 'to license for revenue' describes those situations in which a governmental unit that did not have the power to tax attempted to raise revenue by the exercise of its police power." *Rozner*, 55 Ill. 2d at 433 (citing *City of Chicago Heights v. Western Union Telegraph Co.*, 406 Ill. 428, 433-34 (1950), and *Lamere v. City of Chicago*, 391 Ill. 552, 558-59 (1945)). The court held that the City had "not attempted to tax under the guise of its power to regulate" and the wheel-tax ordinance was "frankly a taxing measure." *Rozner*, 55 Ill. 2d at 433 (citing *City of Chicago v. Hastings Express Co.*, 369 Ill. 610, 615-16 (1938), and *Ayers v. City of Chicago*, 239 Ill. 237, 246-47 (1909)).

¶ 94     Similarly, in *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 575-76 (1974), our supreme court held that a Cook County tax ordinance on employers who employ 15 or more employees was not a license for revenue. The plaintiffs argued that parts of the tax ordinance had attributes of a license for revenue, including that the "section *** requires every employer covered by the ordinance to register, that other licenses granted the employer by the defendant city may be revoked or suspended for willful evasion of the tax ***, and that upon conviction of violation of the ordinance sanctions of both fines and imprisonment may be imposed." *Paper Supply*, 57 Ill. 2d at 575. The court, however, found that these provisions did not convert the tax into a license for revenue (*Paper Supply*, 57 Ill. 2d at 576 (citing *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 424 (1973))), and that the ordinance was "clearly a taxing measure and was not enacted under the city's power to regulate" (*Paper Supply*, 57 Ill. 2d at 576).

¶ 95     Likewise, in the case at bar, we cannot agree with the trial court that the tax imposed by the Tax Ordinance was a license for revenue. The trial court found that parts of the Tax Ordinance, such as requiring an owner to register the machine, are indicative of a license. However, the tax ordinance in *Paper Supply* also required the taxed party (an employer) to register, and our supreme court held it was not a license for revenue. Like *Paper Supply*, in the instant case, we cannot find that registering, affixing an emblem, and labeling a gambling machine; maintaining records of transactions; and making the premises available for inspection convert this tax into a license for revenue.

¶ 96     Plaintiff argues that the tax is a license for revenue because an owner's failure to affix the emblem on the machine could result in penalties, including citations, which can be issued by the sheriff and sheriff's police, and fines.[4] Plaintiff argues that "Cook County cannot, by threat of its police power, impose a tax simply to allow Rivers Casino to operate under a statewide license." The County, however, argues that the enforcement provisions are common and in reality "taxing measures must contain enforcement mechanisms of this type." We agree with the County.

¶ 97     In *Paper Supply*, the tax ordinance at issue had similar provisions and failure to abide by the ordinance could result in fines and imprisonment. *Paper Supply*, 57 Ill. 2d at 575. Similarly, in *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 424 (1973), the City of Chicago enacted a parking tax ordinance where failure to pay the tax could result in the suspension or revocation of any city license the operator of the parking facility holds. Our supreme court held that the tax was not a license for revenue and those penalties were " 'but provisions to insure the integrity of the collection procedures.' " *Jacobs*, 53 Ill. 2d at 424 (quoting *S. Bloom, Inc. v. Korshak*, 52 Ill. 2d 56, 63 (1972)); see also *Forsberg v. City of Chicago*, 151 Ill. App. 3d 354, 363 (1986) ("The legislature's power to impose penalties to aid administration and insure collection of taxes has long been uniformly recognized."). As the County notes, these measures are in place only to confirm that the tax is paid, not to regulate. The possible use of police power does not mean that the County enacted the Tax Ordinance in the case at bar pursuant to its regulatory powers; the police power is only used for instances of noncompliance. We cannot find that the penalties, including citations and fines, transform this Tax Ordinance into a license for revenue.

---

[4]The Tax Ordinance states that if plaintiff does not purchase and display an emblem it is liable for a $1,000 fine for its first offense and $2,000 for every subsequent offense.

¶ 99        Finally, the County argues that the trial court erred in finding that the Tax Ordinance violates the uniformity clause of the Illinois Constitution. The uniformity clause provides that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2. Our supreme court has stated that to be constitutional under the uniformity clause, "[i]t is well established that a classification of a non-property tax [(1)] must be based on a real and substantial difference between the people taxed and not taxed, and [(2)] must bear some reasonable relationship to the object of the legislation or to public policy." *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 247 (1992) (citing *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 468 (1987)).

¶ 100      In the case at bar, the trial court applied this two-prong test and found that the ordinance violated the uniformity clause. In its grant of summary judgment, the trial court identified two categories of taxpayers: the owners of gambling devices subject to a $1,000 tax and the owners of video gaming terminals subject to a $200 tax, and the court found that there was no real and substantial difference between the owners of the two types of devices. The trial court noted that the County indicated that video gaming terminals earned $200 in daily revenue but did not provide support for its calculation of this number. Additionally, the trial court stated that the County did not provide support for its assertion that video gaming terminals are generally found in bars and restaurants. Finally, the trial court noted that "being regulated through two separate and distinct statutes does not, by itself, justify a classification under the uniformity clause." Under the second prong, the trial court also found the classification had no relationship to the object of the legislation or public policy. The County had argued that the purpose of the legislation was to generate revenue to help offset the increased costs the County incurred by gambling addicts and that the classification was related to that purpose because it was logical to assume casinos attract more gambling addicts than bars and restaurants, where video gaming terminals are located. The trial court found that there was a "vital flaw" in the County's argument because there was nothing prohibiting video gaming terminals at casinos. The trial court also found that the County had not provided evidence that video gaming terminals are used only at bars and restaurants or predominantly used at bars and restaurants.

¶ 101      On appeal, the County first argues that the trial court erred in finding the County's asserted justification for the tax classifications lacked evidentiary support because the government had no evidentiary burden in asserting a justification for a given tax classification. We agree.

¶ 102      Our supreme court addressed the issue related to the parties' burdens in *Wirtz v. Quinn*, 2011 IL 111903, ¶ 83:

> "A taxpayer raising a uniformity challenge 'is not required to prove that every conceivable explanation for the tax is unreasonable. Rather, the taxing body must "produce a justification for its classifications." ' [*Arangold*, 204 Ill. 2d] at 156 (quoting *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992)). This does not mean, however, that the taxing body has an evidentiary burden or is required to produce facts to justify the classification. *Arangold*, 204 Ill. 2d at 156. The court's inquiry regarding the proffered justification is narrow, and '[i]f a set of facts "can be reasonably conceived that would sustain it, the classification must be upheld." ' *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 73 (2008) (citing

*Geja's Cafe*, 153 Ill. 2d at 248). Once the taxing body has offered a justification for the classification, the plaintiff then has the burden to persuade the court that the defendant's explanation is insufficient as a matter of law or unsupported by the facts. *Arangold*, 204 Ill. 2d at 156; *Sun Life Assurance Co. of Canada v. Manna*, 227 Ill. 2d 128, 136-37 (2007)."

Accordingly, the County was required to "produce a justification for its classifications" (internal quotation marks omitted) (*Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 156 (2003)), but was not required to produce evidentiary support.

¶ 103    Next, the County argues that the Tax Ordinance does not violate the uniformity clause because the distinction between gambling devices and video gaming terminals is based on a real and substantial difference and bears a reasonable relationship to the object of the legislation and public policy. As noted, our supreme court has established a two-prong test to determine if a nonproperty tax classification conforms with the uniformity clause. The classification must: (1) be based on a real and substantial difference between the people taxed and not taxed, and (2) must bear some reasonable relationship to the object of the legislation or to public policy. *Searle*, 117 Ill. 2d at 468.

¶ 104    The County first argues that there is a "real and substantial difference" between gambling devices and video gaming terminals, and we agree. To establish that there is a real and substantial difference between the two gambling machines, the County argues that one difference between gambling devices and video gaming terminals is that they are regulated through two "separate and distinct statutes" and the statutes set forth different tax rates for each. The County also argues that gambling devices and video gaming terminals are located in different establishments to further its argument. Gambling devices are generally located in casinos, where there are a large number of machines, and the County suggests the purpose of patrons frequenting casinos is to gamble. In contrast, the County argues video gaming terminals are often located in "mom and pop" establishments, which are limited to one to five terminals per establishment, and the County suggests the purpose of patrons frequenting those establishments is to eat, drink, or socialize, and gambling is only incidental to that purpose. The County also argues that the gambling devices at Rivers Casino, the only casino in Cook County, average more than $800 a day in revenue compared to $200 a day for video gaming terminals. Finally, the County states that "the two-tiered tax scheme is clearly justified when the use of each Gambling Machine is considered as well as the amount of revenue generated by each."

¶ 105    Plaintiff, however, argues that the Tax Ordinance created arbitrary categories of taxpayers and that the County failed to produce any facts to meet the two-prong test. Plaintiff argues that the County's distinction between the tax differences does not create a real and substantial difference, and proposes the proper comparison would be "to compare the total revenue from a slot machine and the total revenue from a video gaming terminal under similar use and similar conditions." Plaintiff also argues that defendant is incorrect that video gaming terminals are operated by "mom and pop" establishments but instead are operated by large corporations.

¶ 106    In *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 66 (2008), the Illinois legislature had passed an act that required casinos with adjusted gross receipts (AGR) of over $200 million "to daily contribute 3% of their AGR into the Horse Racing Equity Trust Fund." Out of nine Illinois riverboat casinos at the time, only four had AGRs over $200 million, and those four were located upstate. *Empress*, 231 Ill. 2d at 65. The defendants argued that those

casinos with AGRs over $200 million could "better absorb the surcharge" and that was "a proper basis for distinguishing the casinos." *Empress*, 231 Ill. 2d at 76. Our supreme court determined that the defendants had produced a justification for the classification and the plaintiffs had failed to show the justification was "insufficient as a matter of law or unsupported by the facts." *Empress*, 231 Ill. 2d at 78. Our supreme court further said, "the downstate casinos' average intake is between $2 and $6 million per month, while the upstate casinos, located in more populated areas, have an average intake of $20 to $40 million per month. This is a substantial difference." *Empress*, 231 Ill. 2d at 78.

¶ 107    Similarly, we find that there is a "real and substantial difference" between gambling devices and video gaming terminals. Although the County produced numerous justifications for distinguishing between the two, its argument can be separated into differences in revenue and differences in the environments in which the machines are used. The County stated that gambling devices average $800 a day in revenue and video gaming terminals average $200 a day in revenue. The corresponding taxes in the ordinance for each are roughly equivalent to one day's revenue. Like *Empress*, the difference in revenue between the two machines is a "real and substantial difference." *Empress*, 231 Ill. 2d at 78. Because the County provided a reasonable justification, the burden shifted to the plaintiff to "persuade the court that the defendant's explanation is insufficient as a matter of law, or unsupported by the facts." (Internal quotation marks omitted.) *Arangold*, 204 Ill. 2d at 156. Plaintiff's response to this justification is that the County did not produce any facts and that the proper comparison would be "to compare the total revenue from a slot machine and the total revenue from a video gaming terminal under similar use and similar conditions." We do not find plaintiff met its burden. Plaintiff produced no evidence that there even are gambling devices and video gaming terminals "under similar use and similar conditions." Furthermore, plaintiff produced no evidence that using this comparison would result in different total revenues than the County asserts. Accordingly, we find the difference in revenue is a "real and substantial difference" between gambling devices and video gaming terminals and justifies the classification between the two.

¶ 108    The County next argues that the distinction between gambling devices and video gaming terminals bears a reasonable relationship to the object of the legislation and public policy, and we agree.

¶ 109    The County argues that it produced a valid justification for classification because the purpose of the tax was to "account for measurable differences in revenue generated as well as the practical use of each establishment" and that plaintiff "failed to allege that the justification is insufficient as a matter of law." The County also argues that casinos are more likely to attract gambling addicts and should absorb more of the costs to combat the negative effects of gambling.

¶ 110    Plaintiff argues that the Illinois Gaming Board already regulates the issue of "problem gambling." These regulations include "establishing and maintaining a 'self-excluded patron' list for people who believe they suffer from gambling addiction." Plaintiff must also provide resources for gambling addiction in all its marketing materials. Plaintiff argues that video gaming terminals are not subject to the same regulations.

¶ 111    As an initial matter, we note that the purpose of the tax was not explicitly listed in the Tax Ordinance. In its complaint, plaintiff suggests the purpose for the tax is to "combat crime, health problems, and addictions related to gambling." The County suggests in its brief that the

purpose is to "generate revenue to help offset the increased costs incurred by Cook County as a result of the pathological gamblers and other gambling addicts who use these machines." An article from the County's website, which was dated October 30, 2012, and was authored by "Communications Staff," stated that County President Toni Preckwinkle "decided to create a tiered system, taking into consideration the potential daily revenue of machines and the impact they have on public health and safety in Cook County." The article quoted Preckwinkle as saying, " 'We plan to tax them a little more than one day's revenue,' " and further quoted her as saying, " 'It's a small price to pay to help with the impact on crime, health and addiction. And we've reduced the impact on smaller mom and pop establishments.' " The article indicated that "[t]he additional revenue generated by this tax will help the County invest in public safety and criminal justice services to combat the negative impacts of compulsive gambling and other gambling addictions." The common theme between these differing accounts is that the purpose of the Tax Ordinance is to generate revenue to combat the negative effects of gambling.

¶ 112    Here, the County provided a reasonable explanation for how the distinction between the machines relates to the object of the ordinance: casinos are more likely to attract gambling addicts and should absorb more of the costs to combat the negative effects of gambling. The County was not required to produce evidentiary support at this time, only a justification for classification. See *Arangold*, 204 Ill. 2d at 156. Instead of refuting the claim that casinos attract more gambling addicts, plaintiff focused its argument on the fact that it already provides services to combat the negative effects of gambling. Plaintiff failed to show how the services it currently provides demonstrate that the distinction between gambling devices and video gaming terminals does not bear a reasonable relationship to the object of the legislation and public policy. Therefore, plaintiff has not met its burden. See *Arangold*, 204 Ill. 2d at 156 (once the taxing body has offered a justification for the classification, "[t]he plaintiff then has the burden to persuade the court that the defendant's explanation is insufficient as a matter of law, or unsupported by the facts" (internal quotation marks omitted)). We agree with the County that the distinction between gambling devices and video gaming terminals bears a reasonable relationship to the object of the legislation and public policy.

¶ 113    In conclusion, our supreme court has stated that to survive a uniformity challenge, a classification must: (1) be based on a real and substantial difference between the people taxed and not taxed, and (2) must bear some reasonable relationship to the object of the legislation or to public policy. *Searle*, 117 Ill. 2d at 468. The County stated that the differences in daily revenue is a "real and substantial difference" and is a justification for the distinction. Plaintiff did not provide any evidence that this was "insufficient as a matter of law, or unsupported by the facts." (Internal quotation marks omitted.) *Arangold*, 204 Ill. 2d at 156. Similarly, the County stated the Tax Ordinance was reasonably related to the object of the legislation because casinos are more likely to attract gambling addicts and should absorb more of the costs to combat the negative effects of gambling. Again, plaintiff failed to produce any evidence that the distinction is not reasonably related to the object of the legislation or public policy. For these reasons, we reverse the trial court's decision and find the Tax Ordinance is constitutional with regards to the uniformity clause.

¶ 114                              CONCLUSION

¶ 115        For the reasons set forth above, we reverse the trial court's entry of summary judgment in plaintiff's favor. We find that (1) the Tax Ordinance was not preempted by the Riverboat Gambling Act, (2) the tax imposed by the Tax Ordinance was not an impermissible occupation tax, (3) the tax imposed by the Tax Ordinance was not an impermissible license for revenue, and (4) the Tax Ordinance did not violate the Illinois Constitution's uniformity clause due to its distinction between gambling devices and video gaming terminals.

¶ 116        Reversed.