# Illinois Official Reports

## Appellate Court

*Accel Entertainment Gaming, LLC v. Village of Elmwood Park*,
2015 IL App (1st) 143822

| | |
|---|---|
| Appellate Court Caption | ACCEL ENTERTAINMENT GAMING, LLC, an Illinois Limited Liability Company, Plaintiff-Appellant, v. THE VILLAGE OF ELMWOOD PARK, an Illinois Municipal Corporation; and ANGELO "SKIP" SAVIANO, President; PAUL VOLPE, Manager; ALAN T. KAMINSKI, Trustee; JEFF SARGENT, Trustee; ANGELA STRANGERS, Trustee; JONATHAN L. ZIVOJNOVIC, Trustee; ANTHONY DEL SANTO, Trustee; and ANGELO J. LOLLINO, Trustee, in Their Official Capacities, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3822 |
| Filed | December 11, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CH-7357; the Hon. Kathleen G. Kennedy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael A. Ficaro, William Bogot, and Seth A. Horvath, all of Nixon Peabody LLP, of Chicago, for appellant.<br><br>Jane M. May and Benjamin M. Jacobi, both of O'Halloran Kosoff Geitner & Cook, LLC, of Northbrook, for appellees. |

| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. |
| --- | --- |
| | Presiding Justice Reyes and Justice McBride concurred in the judgment and opinion. |

## OPINION

¶ 1  The instant appeal arises from the trial court's dismissal of the complaint of plaintiff Accel Entertainment Gaming, LLC, pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). Plaintiff's complaint challenged the validity of defendant Village of Elmwood Park's (Village) Video Gaming Ordinance (Ordinance) (Village of Elmwood Park Ordinance No. 2013-20 (adopted Sept. 16, 2013)) under the Illinois Constitution, alleging that (1) the Ordinance imposed an unconstitutional occupation tax, (2) the Village's power to tax under the Ordinance had been preempted by the Illinois legislature, (3) the Ordinance went beyond the scope of the Village's home rule powers because it attempted to regulate an area of state concern, and (4) the Ordinance imposed an unconstitutional license for revenue. The trial court dismissed plaintiff's claims with prejudice under section 2-615 of the Code and plaintiff appeals. For the reasons that follow, we affirm.

¶ 2                BACKGROUND

¶ 3          I. The Video Gaming Ordinance

¶ 4  On September 16, 2013, the Village enacted the Ordinance, which imposed registration, licensing, and fee requirements on "video gaming operations" within the Village. The Ordinance's language largely parroted the existing language of the Video Gaming Act (230 ILCS 40/1 *et seq.* (West 2012)) and its accompanying regulations (11 Ill. Adm. Code 1800).[1]

¶ 5  Under the Ordinance, "Video Gaming Operation[s]" were defined as "the conducting of video gaming and all related activities." Village of Elmwood Park Ordinance No. 2013-20, § 57-1 (adopted Sept. 16, 2013). A "Video Gaming Terminal" was defined as "[a]ny electronic video game machine that, upon insertion of cash, is available to play or simulate the play of a video game, including, but not limited to, video poker, line up, and blackjack, as authorized by the Illinois Gaming Board utilizing a video display and microprocessors in which the player may receive free games or credits that can be redeemed for cash. The term does not include a machine that directly dispenses coins, cash, or tokens or is for amusement

---

[1]This court's independent comparison of the language of the Ordinance and the language of the Video Gaming Act and its regulations reveals that approximately 44 of the 48 pages of the Ordinance are verbatim duplicates of language found in the Video Gaming Act or its regulations, with 4 pages' worth of content that is unique to the Ordinance. Other than these four pages, the only substantive difference is that the Ordinance gives to the Village's liquor commissioner power that the Video Gaming Act and its regulations gave to the Illinois Gaming Board and its Administrator.

purposes only." Village of Elmwood Park Ordinance No. 2013-20, § 57-1 (adopted Sept. 16, 2013).

¶ 6    The Ordinance required that anyone seeking to operate a video gaming terminal in the Village was required to obtain a video gaming license from the Village's liquor commissioner. Village of Elmwood Park Ordinance No. 2013-20, § 57-15(a)(1) (adopted Sept. 16, 2013). In order to become licensed, an applicant needed to submit the Village's video gaming application, along with accompanying documentation. Village of Elmwood Park Ordinance No. 2013-20, § 57-16(a) (adopted Sept. 16, 2013). This application required the applicant to provide information concerning business ownership, taxes, criminal or civil proceedings, and outstanding contracts, among other information. It also required applicants to submit their Illinois Gaming Board disclosure forms. In considering whether to issue a license, the liquor commissioner was allowed to consider a number of factors, including whether the issuance of the license would lead to an "undue economic concentration" in a certain area of the Village. Village of Elmwood Park Ordinance No. 2013-20, § 57-10 (adopted Sept. 16, 2013).

¶ 7    Each video gaming terminal that was licensed by the Village received a Village registration tag that needed to be affixed to the video gaming terminal. Village of Elmwood Park Ordinance No. 2013-20, § 57-13(b) (adopted Sept. 16, 2013). The Ordinance gave the Village the right to seize any video gaming terminal that did not display this registration tag. Village of Elmwood Park Ordinance No. 2013-20, § 57-13(c) (adopted Sept. 16, 2013). In addition, each licensee was required to pay an annual $1,000 "license fee[ ]"[2] per video gaming terminal. Village of Elmwood Park Ordinance No. 2013-20, § 57-16(h) (adopted Sept. 16, 2013); Village of Elmwood Park Ordinance No. 2013-20, § 29-11(d) (adopted Sept. 16, 2013).

¶ 8    Under the Ordinance, the Village's liquor commissioner had jurisdiction and supervision over all video gaming operations within the Village, subject to the jurisdiction of the Illinois Gaming Board. Village of Elmwood Park Ordinance No. 2013-20, § 57-2 (adopted Sept. 16, 2013). In accordance with this supervisory role, the Ordinance also provided that "[t]he liquor commissioner and the village's officers, employees and agents shall have unrestricted access to enter the premises or motor vehicles of any licensee or applicant where evidence of compliance or noncompliance with the provisions of the video gaming act, the regulations promulgated under the video gaming act or this chapter may be found." Village of Elmwood Park Ordinance No. 2013-20, § 57-3 (adopted Sept. 16, 2013). The liquor commissioner was given the power to penalize licensees for any violation of the Video Gaming Act or the Ordinance through the "imposition of fines, suspension, revocation or restriction of license, or other disciplinary action." Village of Elmwood Park Ordinance No. 2013-20, § 57-15(a) (adopted Sept. 16, 2013).

¶ 9    The Ordinance limited the number of licenses and video game terminals that could be operated in the Village. Village of Elmwood Park Ordinance No. 2015-01, § 57-22 (adopted

---

[2]Plaintiff refers to this annual cost as a "Terminal Tax." However, the Ordinance refers to it as a "license fee," and we will use the Ordinance's terminology in discussing it.

Feb. 2, 2015).[3] Licensed video game terminal operators were under a duty to "[n]ot install, remove or relocate any video gaming terminal in the village without notification and approval of the liquor commissioner or his or her designee." Village of Elmwood Park Ordinance No. 2013-20, § 57-6(r) (adopted Sept. 16, 2013).

¶ 10                                    II. Complaint

¶ 11        On April 29, 2014, plaintiff filed a verified complaint for declaratory and injunctive relief; the complaint was amended on June 26, 2014, and it is the amended complaint that was the subject of defendants' motion to dismiss and the instant appeal. Plaintiff alleged that it was an Illinois limited liability company that was licensed and in good standing with the state's regulatory gaming authorities. On February 28, 2014, the Illinois Gaming Board approved plaintiff's request to transport three video gaming terminals to a bar in Elmwood Park. Plaintiff requested that the Village waive its requirement that plaintiff provide, as part of its application for a license from the Village, copies of its video gaming business entity disclosure form, video gaming institutional investor form, video gaming personal disclosure form, video gaming terminal operator license application, and video gaming trust disclosure form. Plaintiff informed the Village that it had already provided these forms to the Illinois Gaming Board when plaintiff received its current state gaming license.

¶ 12        On March 25, 2014, under supervision of the Illinois Gaming Board, plaintiff's three video gaming terminals were installed and activated at the bar. Plaintiff was then required to immediately deactivate the terminals, as it had not yet paid the $1,000 per terminal license fee or produced the required documents in order to obtain a license from the Village. On March 27, 2014, the Village denied plaintiff's request to waive the production of the required documents.

¶ 13        Plaintiff then filed its complaint, arguing that the Ordinance was facially unconstitutional because: (1) the $1,000 per year per terminal license fee was an impermissible "occupation tax"; (2) the Riverboat Gambling Act (230 ILCS 10/1 *et seq.* (West 2012)), which was incorporated into the Video Gaming Act, prohibited such a tax; (3) the Ordinance exceeded the Village's home rule authority; and (4) the yearly license fee was a "license for revenue," prohibited by the Illinois Constitution. Plaintiff sought a declaratory judgment on all counts, as well as a "preliminary and permanent injunction prohibiting the Village from enforcing the Ordinance against [plaintiff] and any licensed establishments where [plaintiff] operates and maintains licensed [video gaming terminals]."

¶ 14        Count I of the complaint alleged that the Ordinance imposed an impermissible occupation tax on plaintiff through its $1,000 "license fee." Count I alleged that the Illinois Constitution prohibited a home rule unit, such as the Village, from enacting an occupation tax without express sanction from the General Assembly, and it further alleged that the Riverboat Gambling Act, which was incorporated into the Video Gaming Act, contained an express prohibition against occupation taxes. Count I sought a declaration that the Ordinance violated the Illinois Constitution by imposing an illegal occupation tax and a preliminary and permanent injunction enjoining the imposition and enforcement of the fee against plaintiff.

_____

[3]While the Village has adopted a new version of this section of the Ordinance, the only difference between the new section and the original section is the number of licenses and video gaming terminals that are authorized.

¶ 15    Count II of the complaint alleged that section 21 of the Riverboat Gambling Act (230 ILCS 10/21 (West 2012)), which was incorporated into the Video Gaming Act, prohibited the Village from imposing its license fee on terminal operators. Count II sought a declaration that the Riverboat Gambling Act and Video Gaming Act prohibited the Village from imposing the license fee and a preliminary and permanent injunction prohibiting the Village from levying or collecting the license fee from plaintiff.

¶ 16    Count III of the complaint alleged that the Village's home rule authority only extended to areas of local concern and that the regulation of gambling was not a local concern. Count III of the complaint alleged that the state had traditionally regulated gambling and that, because of the state's regulatory structure, gambling was a statewide concern. Count III sought a declaration that the Ordinance, as a whole, was facially unconstitutional and a preliminary and permanent injunction prohibiting the Village from enforcing the Ordinance against plaintiff.

¶ 17    Count IV of the complaint alleged that the license fee violated the Illinois Constitution because it was a license for revenue which was impermissible without the explicit approval of the General Assembly. Count III sought a declaration that the fee violated the Illinois Constitution as a license for revenue and a preliminary and permanent injunction enjoining the imposition and enforcement of the fee against plaintiff.

¶ 18                                    III. Temporary Restraining Order

¶ 19    On June 23, 2014, plaintiff filed an emergency motion for a temporary restraining order and preliminary injunction on count III of plaintiff's complaint. In support of its motion, plaintiff argued that the Village had exceeded its home rule authority in regulating video gaming through the Ordinance. Plaintiff claimed that it was suffering irreparable harm by not running its video gaming terminals, whereas the Village would not be harmed by the circuit court enjoining enforcement of the Ordinance. Specifically, plaintiff requested that the court prohibit the Village from: (1) charging the $1,000 per video game terminal fee; (2) requiring plaintiff to produce the aforementioned documentation in order to obtain a Village license; (3) capping the number of licensed video game terminal operators and video game terminals in the Village; and (4) interfering with plaintiff's installation and operation of video game terminals at the bar or in any other location in the Village. On July 21, 2014, the trial court denied plaintiff's motion for a temporary restraining order.

¶ 20                                        IV. Motion to Dismiss

¶ 21    On July 8, 2014, defendants filed a motion to dismiss plaintiff's amended complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)). The motion claimed that: (1) the Ordinance was a valid exercise of the Village's home rule authority and (2) plaintiff failed to allege that the Village's license fee was not reasonably related to regulation.

¶ 22    On November 19, 2014, the trial court issued a written opinion granting defendants' motion to dismiss. With respect to count III of plaintiff's amended complaint, concerning the Village's home rule authority to regulate video gaming within the Village, the trial court found that "the current test is if a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, then municipalities may exercise their power," citing to *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 32.

The trial court noted that the Video Gaming Act lacked express legislative preemption of local video gaming regulation, making the sole question whether video gaming pertained to local government and affairs. The court found that because the General Assembly had not specifically limited home rule authority in relation to gambling, "[w]hen video gambling takes place within establishments already regulated by a municipality, that video gambling is related to local governance and enforcement, and as Defendants argue, affects the very fabric of the local community." The trial court further found that "[t]he state cannot, consistent with home-rule jurisprudence, create a 'system' which by its nature raises issues of local concern, and then remove that 'system' from local oversight without expressly saying so." As such, the trial court dismissed count III of plaintiff's complaint with prejudice.

¶ 23    As to counts I, II, and IV of plaintiff's complaint, all of which challenged the Village's $1,000 license fee by characterizing it as a tax, the trial court noted that a fee was compensation for services rendered, while a charge having no relation to the services rendered was properly characterized as a tax. The trial court found that "Accel alleges no facts to show that the Village's charge of $1,000 per [video gaming terminal] per year is not reasonably related to the regulation it has undertaken in the Ordinance it enacted." Accordingly, the court found that there was no set of facts showing that the imposition of the $1,000 annual charge was an unconstitutional tax and dismissed counts I, II, and IV with prejudice.

¶ 24    This appeal timely followed.

¶ 25                                    ANALYSIS

¶ 26    On appeal, plaintiff argues that the trial court erred in dismissing plaintiff's amended complaint because (1) count III of the complaint sufficiently alleged that the Ordinance exceeds the Village's home rule authority and (2) the complaint sufficiently alleged that the licensing fee was a tax, not a fee, and that the tax was unconstitutional.

¶ 27    A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint by alleging defects on its face. *Young v. Bryco Arms*, 213 Ill. 2d 433, 440 (2004); *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The critical inquiry is whether the allegations in the complaint are sufficient to state a cause of action upon which relief may be granted. *Wakulich*, 203 Ill. 2d at 228. In making this determination, all well-pleaded facts in the complaint, and all reasonable inferences that may be drawn from those facts, are taken as true. *Young*, 213 Ill. 2d at 441. In addition, we construe the allegations in the complaint in the light most favorable to the plaintiff. *Young*, 213 Ill. 2d at 441. We review *de novo* an order granting a section 2-615 motion to dismiss. *Young*, 213 Ill. 2d at 440; *Wakulich*, 203 Ill. 2d at 228. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 28    "In construing the validity of a municipal ordinance, the same rules are applied as those which govern the construction of statutes." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Municipal ordinances are presumed constitutional (*Chicago Allis Mfg. Corp. v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 320, 327 (1972); *Van Harken v. City of Chicago*, 305 Ill. App. 3d 972, 976 (1999) (citing *City of Chicago Heights v. Public Service Co. of Northern Illinois*, 408 Ill. 604, 609 (1951)), and the challenging party has the

burden of establishing a clear constitutional violation (*People v. One 1998 GMC*, 2011 IL 110236, ¶ 20). A court will affirm the constitutionality of a statute or ordinance if it is "reasonably capable of such a determination" and "will resolve any doubt as to the statute's construction in favor of its validity." *One 1998 GMC*, 2011 IL 110236, ¶ 20 (citing *People v. Johnson*, 225 Ill. 2d 573, 584 (2007), and *People v. Boeckmann*, 238 Ill. 2d 1, 6-7 (2010)).

¶ 29 We note that plaintiff's challenge to the Ordinance is a facial constitutional challenge. In a facial challenge, a court examines whether the statute or ordinance at issue contains "an inescapable flaw that renders the *** statute unconstitutional under every circumstance." *One 1998 GMC*, 2011 IL 110236, ¶ 58. "[A] challenge to the facial validity of a statute is the most difficult challenge to mount successfully because an enactment is invalid on its face only if no set of circumstances exists under which it would be valid." *One 1998 GMC*, 2011 IL 110236, ¶ 20 (citing *Napleton*, 229 Ill. 2d at 305-06); see also *In re M.T.*, 221 Ill. 2d 517, 536 (2006) ("Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances." (Emphasis in original.)). Since a successful facial challenge will void the statute for all parties in all contexts, " '[f]acial invalidation "is, manifestly, strong medicine" that "has been employed by the court sparingly and only as a last resort." ' " *Poo-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009) (quoting *National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). "The invalidity of the statute in one particular set of circumstances is insufficient to prove its facial invalidity." *In re M.T.*, 221 Ill. 2d at 536-37. " ' "[S]o long as there exists a situation in which a statute could be validly applied, a facial challenge must fail." ' " *In re M.T.*, 221 Ill. 2d at 537 (quoting *People v. Huddleston*, 212 Ill. 2d 107, 145 (2004), quoting *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002)).

¶ 30                           I. Home Rule Authority

¶ 31 Plaintiff first argues that the trial court erred in dismissing count III of its complaint because the Village's enactment of its Ordinance exceeded its home rule authority under the Illinois Constitution. We recently considered a similar constitutional challenge in *Midwest Gaming & Entertainment, LLC v. County of Cook*, 2015 IL App (1st) 142786, *appeal denied*, No. 119883 (Ill. Nov. 25, 2015),[4] and our discussion of the law in that case is equally applicable here. Under the Illinois Constitution, except as limited by article VII, section 6 of the constitution, a home rule unit such as the Village "may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a). "Section 6(a) was written with the intention to give home rule units the broadest powers possible." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 30 (citing *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992)). Furthermore, the constitution expressly provides that the "[p]owers

---

[4]Our decision in *Midwest Gaming* was filed after briefing in the instant case had concluded. However, we granted plaintiff's motion to cite additional authority concerning the case and, through the motion and defendants' response, have the parties' arguments about the case and its applicability to the case at bar.

and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 32    Our supreme court has "consistently recognized that the home rule provisions of the Illinois Constitution are intended to eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intention." (Internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "The Illinois approach places almost exclusive reliance on the legislature rather than the courts to keep home rule units in line." (Internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "[I]f the constitutional design is to be respected, the courts should step in to compensate for legislative inaction or oversight only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies." (Emphasis and internal quotation marks omitted.) *Palm*, 2013 IL 110505, ¶ 34. "[B]ecause the legislature can always vindicate state interests by express preemption, only vital state interests would allow a court to decide that an exercise of home rule power does not pertain to local government and affairs." *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, ¶ 22. "Accordingly, '[i]f a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power.' " *Palm*, 2013 IL 110505, ¶ 36 (quoting *StubHub*, 2011 IL 111127, ¶ 22 n.2).

¶ 33    In the case at bar, plaintiff does not argue that the legislature has expressly preempted the Village from regulating video gaming within its boundaries. Instead, plaintiff argues that regulation of video gaming does not pertain to local government or affairs and is a statewide, not local, issue. We do not find this argument persuasive.

¶ 34    Plaintiff asks us to determine whether a subject pertains to local government and affairs by applying the factors set forth by our supreme court in *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984): "Whether a particular problem is of statewide rather than local dimension must be decided not on the basis of a specific formula or listing set forth in the Constitution but with regard for [(1)] the nature and extent of the problem, [(2)] the units of government which have the most vital interest in its solution, and [(3)] the role traditionally played by local and statewide authorities in dealing with it." See *StubHub*, 2011 IL 111127, ¶ 24. Under this analysis, we agree with defendants that the regulation of video gaming within the Village's boundaries is a subject that pertains to the Village's local government or affairs because it implicates the Village's power to regulate for the protection of the public health, safety, morals and welfare of its residents.

¶ 35    First, with regard to the nature and extent of the problem, plaintiff appears to characterize the "problem" as video-gaming regulation generally and argues that video-gaming regulation is a statewide issue, not a local one. However, the Village's concern is not video-gaming regulation generally but regulation of video gaming within the boundaries of the Village itself. The Ordinance at issue in the case at bar applies only to video gaming operations within the Village boundaries and it does not attempt to regulate video gaming operations outside of the Village's boundaries. See, *e.g.*, Village of Elmwood Park Ordinance No. 2013-20, § 57-2 (adopted Sept. 16, 2013) (providing that the Village's liquor commissioner shall have jurisdiction over and shall supervise "all video gaming operations in the village," subject to the jurisdiction of the Illinois Gaming Board).

¶ 36    Next, we must consider whether the State or the Village has the greater interest in solving the problem. See *StubHub*, 2011 IL 111127, ¶ 27. Plaintiff argues that the state's regulatory

structure for gambling "furthers vital state interests," including encouraging tourism, promoting economic development, raising revenue for education, and generating revenue for other state initiatives. While the state certainly has an interest in the areas pointed out by plaintiff, no authority is provided by plaintiff indicating that such interests are "vital" interests that would justify overriding a home rule unit's ordinance, and we are unwilling to apply that label in the absence of such authority. See *Palm*, 2013 IL 110505, ¶ 24 (while the supreme court can intervene in cases involving interference with a "vital state interest," it has done so "only in cases involving environmental regulations based on specific language in the Illinois Constitution establishing the state's supremacy in that field" and declined to find that the state had a vital state interest in regulating condominiums). But see *StubHub*, 2011 IL 111127, ¶ 27 (finding that the State had a vital interest "in preserving and regulating the emerging market for online ticket resales across Illinois").

¶ 37     Furthermore, it is not clear how the Village's Ordinance hinders the state's interests, as plaintiff charges, other than its claim that the Ordinance "interferes with [the state's] regulatory framework." Under the Video Gaming Act, a municipality can choose to prohibit video gaming within its boundaries entirely. 230 ILCS 40/27 (West 2012). The state's interests cannot possibly be hindered by the choice not to have video gaming within the municipality at all, as it is an option the state expressly provides to municipalities. Thus, it is difficult to fathom how the Ordinance, which merely limits the number of video gaming machines permitted within the Village's boundaries instead of prohibiting it outright, can hinder the state's interests. It cannot be the case that the very existence of the Ordinance hinders the state's interests, since the text of the constitution itself recognizes that the state and the home rule unit will have laws that operate concurrently and sometimes conflict. See Ill. Const. 1970, art. VII, § 6(i) ("Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive."); *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 287-88 (2001) ("Under section 6(i), home rule units can continue regulating activities in their communities, even if the State also has regulated such activities."). Moreover, as defendants point out, "if 'encouraging tourism,' 'promoting economic development,' and 'generating revenue' are vital state policies such that home rule units cannot regulate activities that affect them, then any home rule unit's zoning and licensing ordinances limiting restaurants, parades, and festivals would be unconstitutional because such ordinances would interfere with vital state policies and thus would not pertain to a local concern." Thus, while the state certainly has an interest in regulation of video gaming statewide, it is not clear that the state's interest is greater than the Village's, as plaintiff argues.[5] Furthermore, plaintiff has not demonstrated that the Village under its Ordinance will interfere with the interests of the state in the adoption and application of its Ordinance.

¶ 38     In contrast to the state's interests in regulating video gaming statewide, defendants have identified a number of the Village's interests in regulating video gaming within its

_____

[5]Plaintiff also argues that the confidential information requested under the Video Gaming Act is specifically protected from disclosure in legal proceedings or Freedom of Information Act requests and that the Ordinance has no such safeguards in place. However, it is unclear what relevance this distinction has in determining which unit of government has the greater interest in solving the problem addressed by the Ordinance.

boundaries through the Ordinance. The video gaming terminals authorized by the Video Gaming Act can be placed in local establishments that are licensed to sell liquor, in fraternal organizations, and in veterans' associations (230 ILCS 40/5 (West 2012)), which defendants argue are all establishments that are already regulated by the Village and are "part of the fabric of [the Village's] community." Defendants argue that the addition of video gaming terminals in these establishments "compounds the need for regulation of enterprises that already run a risk of criminality," claiming that "[i]t is reasonable to conclude that emergency calls to local police for disturbances, robberies, pick-pocketing, and fighting will increase as a result of the addition of video gambling to the community. It is also foreseeable that video gambling could lead to other, illegal gambling, resulting in the need for additional policing." See *Kalodimos*, 103 Ill. 2d at 503 (noting that municipalities "have an obvious interest not only in reducing premeditated crime within their boundaries but also in minimizing the effects of domestic violence or spontaneous quarrels").

¶ 39    Defendants further point to the Village's interest in ensuring that children and people under the age of 21 do not gamble and claim that certain establishments within the community, such as religious or community organizations, might object to video gaming terminals near their locations for moral reasons. Local regulation permits such local concerns to be addressed in ways that they would not be under state regulation. See *Kalodimos*, 103 Ill. 2d at 502 ("Home rule *** is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the state who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem."). Furthermore, video gaming terminal operators who do not wish to comply with the Village's regulations, such as plaintiff in the case at bar, remain free to do business in other locations within the state, as the Village's Ordinance only affects those who seek to do business in the Village.

¶ 40    Finally, we must consider whether the state or the municipality has a traditional role in solving the problem. *StubHub*, 2011 IL 111127, ¶ 35. While the state certainly has the more traditional role in regulating commercial gambling, video gaming has only been permitted within the state for less than a decade. See Pub. Act 96-34, § 1 (eff. July 13, 2009) (adding 230 ILCS 40/1 *et seq.*). The Ordinance was adopted in September 2013, approximately four years after the passage of the Video Gaming Act. Thus, while the state has a more traditional role in the general gambling context, this factor is not particularly strong with respect to the video gaming context specifically.

¶ 41    Thus, in summary, the problem that the Ordinance seeks to resolve is the regulation of video gaming operations within the boundaries of the Village. The state has a general interest in regulating video gaming as a uniform whole, as well as interests in such areas as raising revenue and promoting tourism. The Village has more specific interests concerning regulating video gaming within the Village, such as increased criminality, protection of children and those under the age of 21 from gambling, and the concerns of local organizations, churches, synagogues, and community members concerning morality. Finally, the state has a more traditional role with respect to gambling as whole, but the Video Gaming Act has only been in effect for four years longer than the Ordinance. Considering all of these factors, and bearing in mind that the constitution was written with the intention of giving a

home rule unit the broadest powers possible in its local area (*Palm*, 2013 IL 110505, ¶ 30), we agree with the trial court that the Ordinance promoted the health, safety, and general welfare of the residents of the Village and pertains to the Village's local government and affairs. Accordingly, the Ordinance does not exceed the scope of the Village's home rule authority and the trial court properly dismissed count III of plaintiff's amended complaint.

¶ 42    We do not find plaintiff's reliance on *StubHub* and *County of Cook v. Village of Bridgeview*, 2014 IL App (1st) 122164, to be persuasive. In *StubHub*, after applying the *Kalodimos* factors, the supreme court concluded that a City of Chicago (City) ordinance requiring Internet auction listing services to collect and remit the City's amusement tax did not pertain to the City's local government and affairs. *StubHub*, 2011 IL 111127, ¶ 36. In reaching this conclusion, the court found that "the state has a vital interest in regulating online auctioneers and protecting consumers, and consequently a greater interest than any municipality in local tax collection by internet auction listing services," and also found that the state had a more traditional role in addressing the problem of tax collection by Internet auctioneers. *StubHub*, 2011 IL 111127, ¶¶ 34-36. The court further noted that the state statute and the debates that produced it "evince an intent by the legislature to allow internet auction listing services to opt out of any obligation regarding local tax collection" (*StubHub*, 2011 IL 111127, ¶ 36), which was "a policy decision this court is ill-advised to ignore" (*StubHub*, 2011 IL 111127, ¶ 36). Thus, in the *StubHub* case, there was a conflict between the statute's regulation process and that of the city regulation process, whereas in the instant case, the State has no conflict and has no "vital interest" at stake as a result of the Ordinance, nor is there any evidence that the legislature expressly rejected any of the Ordinance's provisions, as was the case in *StubHub*.

¶ 43    Similarly, in *Village of Bridgeview*, the appellate court found that the Village of Bridgeview exceeded its home rule authority by enacting an ordinance that prohibited Bridgeview residents from operating feral cat colonies, in conflict with a Cook County ordinance permitting such colonies. In applying the *Kalodimos* factors, the court noted that the problem was the spread of rabies by an overpopulation of feral cats and that Bridgeview's ordinance undermined this concern because feral cats were freely roaming animals, finding that the Bridgeview ordinance affected bordering municipalities. *Village of Bridgeview*, 2014 IL App (1st) 122164, ¶ 16. The court further noted that the county had a greater interest in controlling the feral cat population as a whole because counties were better able to address the issue of freely roaming cats than were municipalities, which could not legislate beyond their own borders. *Village of Bridgeview*, 2014 IL App (1st) 122164, ¶ 17. Finally, the court found that the state and the county had more traditional roles in controlling the spread of rabies and the feral cat population. *Village of Bridgeview*, 2014 IL App (1st) 122164, ¶¶ 18-20. By contrast, the Village's Ordinance in the case at bar does not involve activities that freely spread across municipal borders such that the Village is not the appropriate political body to legislate gambling within its borders.

¶ 44    We also do not find persuasive plaintiff's arguments that the language of the Video Gaming Act indicates that the legislature did not contemplate concurrent local regulation of video gaming. We again note that plaintiff is not arguing that the legislature has specifically preempted home rule authority in this area, but is only arguing that the Ordinance does not pertain to the Village's local government and affairs.

¶ 45    In support of its argument that video gaming regulation is a statewide, not local, issue, plaintiff points to the provision of the Video Gaming Act permitting a municipality to opt out of video gaming entirely (230 ILCS 40/27 (West 2012)). Section 27 of the Video Gaming Act provides, in full:

> "A municipality may pass an ordinance prohibiting video gaming within the corporate limits of the municipality. A county board may, for the unincorporated area of the county, pass an ordinance prohibiting video gaming within the unincorporated area of the county." 230 ILCS 40/27 (West 2012).

From this provision, plaintiff argues that "[t]his *** is an all-or-nothing proposition" and that "[p]artial participation with local regulation, which the Village attempts here, is not an option under the [Video Gaming Act]." However, plaintiff provides absolutely no support for this proposition. This section of the Video Gaming Act says nothing about local regulation or any "all-or-nothing proposition." While plaintiff is correct that the Video Gaming Act gives extensive authority to the Illinois Gaming Board, we will not leap to plaintiff's conclusion that this means that "there is no conceivable or intended role for [the Village] or any other local government to regulate video-gaming licensees."

¶ 46    In fact, as defendants point out, there is language in the Video Gaming Act that does contemplate some type of local regulation. Section 65 of the Video Gaming Act provides:

> "A non-home rule unit of government may not impose any fee for the operation of a video gaming terminal in excess of $25 per year." 230 ILCS 40/65 (West 2012).

The existence of this provision demonstrates that the legislature contemplated some local regulation in addition to the Video Gaming Act itself.

¶ 47    Plaintiff argues that since section 65 is silent on the powers of home rule units, this provision supports the argument that home rule authorities have no ability to regulate,[6] citing the general maxim that "[w]hen a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation." *In re C.C.*, 2011 IL 111795, ¶ 34. However, section 65 of the Video Gaming Act does not contain a "list[ ] [of] things to which it refers" (*In re C.C.*, 2011 IL 111795, ¶ 34) but addresses only one subject. Thus, it is not clear that plaintiff's cited maxim has any application to section 65. Furthermore, plaintiff's argument overlooks the fundamental difference between a home rule and a non-home rule unit. Our supreme court has explained that "in the case of a non-home-rule unit, it has only those powers expressly granted by law, powers incidental to those provided by law, and powers which are considered indispensable to the accomplishment of the purposes of the municipal corporation. [Citation.] By contrast, the powers of a home rule municipality *** are derived from article VII, section 6(a), of the Illinois Constitution of 1970 ***." *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992). Thus, as long as the subject pertains to local government and affairs and it is not expressly preempted, the home rule unit can exercise its power. *Palm*, 2013 IL 110505, ¶ 36 (" '[i]f a subject pertains to local government and affairs, and the legislature has not expressly preempted home rule, municipalities may exercise their power' " (quoting *StubHub*, 2011 IL 111127, ¶ 22 n.2)). The same cannot be said of a non-home rule

---

[6]Plaintiff also argues that the legislature's silence "does not raise the inference that home-rule municipalities have authority to tax under the [Video Gaming Act]." However, this section concerns imposition of a fee, which is necessarily tied to regulation. It does not address taxation.

municipality. In other words, the default position for a home rule unit is to be able to legislate local matters, while the default position of a non-home rule unit is to not be able to legislate. See *Palm*, 2013 IL 110505, ¶ 32 ("the Illinois Constitution provides home rule units with the same powers as the sovereign, except when those powers are limited by the General Assembly"). Thus, the legislature's silence on the power of home rule units is actually evidence of the home rule unit's power, not the other way around, as plaintiff argues.

¶ 48   In the case at bar, regulation of video gaming within the Village's boundaries pertains to the local government and affairs of the Village, and plaintiff makes no argument that such regulation has been specifically preempted by the legislature. Accordingly, the Village had the power to enact its Ordinance under its home rule authority and the trial court properly dismissed count III of plaintiff's amended complaint.

¶ 49                                    II. License Fee

¶ 50   Plaintiff also argues that the trial court erred in dismissing counts I, II, and IV of its complaint, all of which challenged the Village's $1,000 license fee, without addressing the merits of plaintiff's challenges. All three of plaintiff's challenges to the license fee are based on the premise that the license fee was actually a tax, not a fee. The trial court dismissed these three counts after determining that plaintiff had not alleged sufficient facts to demonstrate that the Village's charge was a tax and not a fee. Plaintiff argues that the merits of its arguments should have been addressed prior to determining whether the Village's charge was a tax or a fee. We agree with the trial court's conclusion.

¶ 51   Counts I, II, and IV of plaintiff's complaint all challenge the Village's $1,000 license fee. Count I alleges that the license fee is an impermissible occupation tax, prohibited under article VII, section 6(e), of the Illinois Constitution. Count II alleges that section 21 of the Riverboat Gambling Act, incorporated into the Video Gaming Act, prohibited the license fee through its prohibition against license taxes. Count IV of plaintiff's complaint alleges that the license fee is an impermissible license for revenue, prohibited under article VII, section 6(e) of the Illinois Constitution.

¶ 52   Plaintiff first argues that the fact that the license fee is labeled as a "fee" does not exempt it from analysis as a tax. We agree with plaintiff that it is the substance of the provision rather than its title that is important. Our supreme court has explained the difference between a fee and a tax as such: "A fee is defined as a 'charge fixed by law for services of public officers' [citation] and is regarded as compensation for the services rendered [citation]. Thus, court charges imposed on a litigant are fees if assessed to defray the expenses of his litigation. On the other hand, a charge having no relation to the services rendered, assessed to provide general revenue rather than compensation, is a tax. [Citations.]" *Crocker v. Finley*, 99 Ill. 2d 444, 452 (1984). See also *Friedman v. White*, 2015 IL App (2d) 140942, ¶ 12 ("The parties agree that the surcharges at issue must be analyzed as taxes rather than fees because the charges are for general revenue purposes rather than compensation for services rendered."). In the case at bar, regardless of whether the license fee is characterized as a tax or a fee, the trial court properly dismissed plaintiff's complaint because plaintiff's arguments fail even if we consider it a tax.

¶ 53                                            A. Occupation Tax

¶ 54        As noted, count I of plaintiff's complaint alleges that the license fee is an impermissible
occupation tax. Under the Illinois Constitution, "[a] home rule unit shall have only the power
that the General Assembly may provide by law *** (2) to license for revenue or impose taxes
upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII,
§ 6(e). "[A]lthough section 6(e) permits taxes upon the sale or use of tangible items, the
taxation of commercial services constitutes an 'occupation tax' which is prohibited unless
sanctioned by the legislature." *Communications & Cable of Chicago, Inc. v. Department of
Revenue*, 275 Ill. App. 3d 680, 685 (1995) (citing *Commercial National Bank v. City of
Chicago*, 89 Ill. 2d 45 (1982)). The term "upon occupations" was not defined by the framers
of the Constitution. *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 565 (1974).
However, our supreme court has stated that " 'an occupation tax has one of two missions:
either to regulate and control a given business or occupation, or to impose a tax for the
privilege of exercising, undertaking or operating a given occupation, trade or profession.' "
*Town of Cicero v. Fox Valley Trotting Club, Inc.*, 65 Ill. 2d 10, 23 (1976) (quoting *Reif v.
Barrett*, 355 Ill. 104, 109 (1933)).

¶ 55        We recently considered a similar constitutional challenge in our decision in *Midwest
Gaming*, where the plaintiff argued that the Cook County Gambling Machine Tax Ordinance
(Cook County Ordinance No. 12-O-62 (approved Nov. 9, 2012)) imposed an unconstitutional
occupation tax. We determined that we had no need to resolve the question of whether the
tax at issue was in fact an occupation tax, because we found that even if it was, it was
specifically authorized by the legislature though section 5-1009 of the Counties Code (55
ILCS 5/5-1009 (West 2012)). *Midwest Gaming*, 2015 IL App (1st) 142786, ¶ 78.

¶ 56        As we noted in that case, section 5-1009 of the Counties Code is identical in all material
respects to section 8-11-6a of the Illinois Municipal Code (65 ILCS 5/8-11-6a (West 2012)),
which applies to a municipality such as the Village. See 65 ILCS 5/1-1-4 (West 2012)
(providing that the Municipal Code "shall apply generally to all municipalities" incorporated
under the Municipal Code or its predecessor). Section 8-11-6a provides, in relevant part:

            "Home rule municipalities; preemption of certain taxes. Except as provided in
            Sections 8-11-1, 8-11-5, 8-11-6, 8-11-6b, 8-11-6c, and 11-74.3-6 on and after
            September 1, 1990, no home rule municipality has the authority to impose, pursuant
            to its home rule authority, a retailer's occupation tax, service occupation tax, use tax,
            sales tax or other tax on the use, sale or purchase of tangible personal property based
            on the gross receipts from such sales or the selling or purchase price of said tangible
            personal property. Notwithstanding the foregoing, this Section does not preempt any
            home rule imposed tax such as the following: (1) a tax on alcoholic beverages,
            whether based on gross receipts, volume sold or any other measurement; (2) a tax
            based on the number of units of cigarettes or tobacco products (provided, however,
            that a home rule municipality that has not imposed a tax based on the number of units
            of cigarettes or tobacco products before July 1, 1993, shall not impose such a tax after
            that date); (3) a tax, however measured, based on the use of a hotel or motel room or
            similar facility; (4) a tax, however measured, on the sale or transfer of real property;
            (5) a tax, however measured, on lease receipts; (6) a tax on food prepared for
            immediate consumption and on alcoholic beverages sold by a business which
            provides for on premise consumption of said food or alcoholic beverages; or (7) other

taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." 65 ILCS 5/8-11-6a (West 2012).

¶ 57    In *Midwest Gaming*, we found that the plain language of subsection (7) of section 5-1009 of the Counties Code permitted the tax. *Midwest Gaming*, 2015 IL App (1st) 142786, ¶ 82. Similarly, in the case at bar, subsection (7) of section 8-11-6a specifically provides that it "does not preempt any home rule imposed tax such as the following: *** (7) other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." 65 ILCS 5/8-11-6a (West 2012). As in *Midwest Gaming*, there is no argument in the instant case that the Village's license fee is based on the selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property. As such, the license fee is permitted under subsection (7).

¶ 58    Plaintiff argues that the Village has forfeited any argument concerning section 8-11-6a, since it did not raise it before the trial court. However, "the waiver doctrine is a limitation on the parties, not on the reviewing court." *Jackson v. City of Chicago*, 2012 IL App (1st) 111044, ¶ 22. Moreover, we will not fault the Village for failing to raise this argument before when our *Midwest Gaming* decision was a case of first impression on this issue.

¶ 59    Plaintiff further argues that our decision in *Midwest Gaming* was erroneous, because we "failed to consider" section 21 of the Riverboat Gambling Act, "a more specific statute that expressly bars occupation taxes." However, as we found in *Midwest Gaming* and as we will discuss below, section 21 does not apply to home rule units such as the Village.

¶ 60    Finally, plaintiff argues that even assuming that section 8-11-6a could be deemed to provide for occupation taxes, our reading of the statute would render it ambiguous by "creat[ing] an ambiguity between the straightforward ban on occupation taxes in its first sentence and the non-preemption provision in subsection (7)." However, plaintiff's argument fails to recognize that, while *Midwest Gaming* was the first case to construe section 5-1009 of the Counties Code in this way, it was *not* the first case to construe section 8-11-6a in this way.

¶ 61    In *American Beverage Ass'n v. City of Chicago*, 404 Ill. App. 3d 682, 683 (2010), we considered whether a City of Chicago tax of five cents on each bottle of water purchased at retail was permissible. The plaintiffs' first argument was that the bottled water tax was an occupation tax that violated article VII, section 6(e), of the Illinois Constitution, and the appellate court found that the tax was not an occupation tax under the constitution. *American Beverage Ass'n*, 404 Ill. App. 3d at 687. The plaintiffs' next argument was that the City was statutorily prohibited from implementing the bottled water tax, an argument that the appellate court also found meritless. *American Beverage Ass'n*, 404 Ill. App. 3d at 688. Finally, the plaintiffs argued that section 8-11-6a of the Municipal Code (65 ILCS 5/8-11-6a (West 2008)) preempted the bottle water tax. *American Beverage Ass'n*, 404 Ill. App. 3d at 688.

¶ 62    In construing section 8-11-6a, the court found that it did not need to "delve into an extensive analysis of the first sentence of section 8-11-6a, because the second sentence clarifies the General Assembly's intent." *American Beverage Ass'n*, 404 Ill. App. 3d at 690. The court then set forth the second sentence of section 8-11-6a, specifically focusing on subsection (7), which provided that section 8-11-6a did not preempt " 'other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property.' " (Emphasis omitted.) *American Beverage Ass'n*, 404 Ill. App. 3d at 690 (quoting 65 ILCS 5/8-11-6a (West 2008)). After setting forth this language, the court found:

"Thus, exception (7) in the second sentence of section 8-11-6a makes clear that outside the six preceding exceptions, section 8-11-6a does not preempt taxes that are not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property. Exception (7) excepts the bottled water tax from preemption, as it is a flat tax of five cents per bottle and is not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." *American Beverage Ass'n*, 404 Ill. App. 3d at 690.

Thus, this section has now been read in the same manner three times, and we do not find persuasive plaintiff's attempt to characterize our earlier decision as creating an ambiguity in the statute. Accordingly, we continue to adhere to our decision in *Midwest Gaming* that, even if the Ordinance imposed an occupation tax, it was specifically authorized by the legislature. Thus, the trial court properly dismissed count I of plaintiff's complaint.

¶ 63                              B. Section 21 of the Riverboat Gambling Act

¶ 64    Count II of plaintiff's complaint alleges that the Village's licensing fee violates an express limitation on the Village's home rule authority because section 21 of the Riverboat Gambling Act, which was incorporated into the Video Gaming Act, explicitly preempts home rule units from imposing a license tax. We do not find this argument persuasive.

¶ 65    Section 21 of the Riverboat Gambling Act is entitled "Limitation on taxation of licensees" and provides, in full:

"Limitation on taxation of licensees. Licensees shall not be subjected to any excise tax, license tax, permit tax, privilege tax, occupation tax or excursion tax which is imposed exclusively upon the licensee by the State or any political subdivision thereof, except as provided in this Act." 230 ILCS 10/21 (West 2012).

Plaintiff's arguments concerning the effects of this section are arguments that we expressly considered in *Midwest Gaming*, and our reasoning there is equally applicable here.

¶ 66    The General Assembly "may *** preempt the exercise of a municipality's home rule powers by expressly limiting that authority." *Palm*, 2013 IL 110505, ¶ 31 (citing *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill. 2d 281, 287 (2001)). Under article VII, section 6(h), "[t]he General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit other than a taxing power." Ill. Const. 1970, art. VII, § 6(h). With respect to the power to tax, "[t]he General Assembly by a law approved by the vote of three-fifths of the members elected to each house may deny or limit the power to tax and any other power or function of a home rule unit not exercised or performed by the State." Ill. Const. 1970, art. VII, § 6(g). "If the legislature intends to limit or deny the exercise of home rule powers, the statute must contain an express statement to that effect." *Palm*, 2013 IL 110505, ¶ 31 (citing *City of Evanston v. Create, Inc.*, 85 Ill. 2d 101, 108 (1981)).

¶ 67    Our constitution requires specificity when denying a home rule unit the use of its powers. *Palm*, 2013 IL 110505, ¶ 31; see also *Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill. 2d 133, 138 (1994) ("In order to meet the requirements of section 6(h), legislation must contain express language that the area covered by the legislation is to be exclusively controlled by the State."); *Mulligan v. Dunne*, 61 Ill. 2d 544, 550 (1975) ("a statute which purports to restrict home-rule powers must be specific"); *City of Chicago v.*

*Roman*, 184 Ill. 2d 504, 520 (1998) (no preemption where "the Corrections Code, although quite comprehensive, does not expressly limit the concurrent exercise of the City's home rule power or require such exercise to conform to or be consistent with the Code"). The legislature has codified this principle through section 7 of the Statute on Statutes (*Palm*, 2013 IL 110505, ¶ 32), which provides that "[n]o law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2012).

¶ 68    Both in *Midwest Gaming* and in the instant case, there can be no dispute that section 21 of the Riverboat Gambling Act does not "specifically set[ ] forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2012). Accordingly, in *Midwest Gaming*, we found that "[w]hile we agree that the term 'any political subdivision' can be interpreted to include home rule units in certain contexts, here, the language of the statute, quite simply, is not specific enough for us to reach that conclusion." *Midwest Gaming*, 2015 IL App (1st) 142786, ¶ 71.

¶ 69    In the instant case, plaintiff cites one case, *Des Plaines Firemen's Ass'n v. City of Des Plaines*, 267 Ill. App. 3d 920 (1994), which it argues supports its argument that section 21 preempts the Village's home rule authority. Plaintiff argues that in that case, "this Court held that language substantially similar to the language of Section 21 of the [Riverboat Gambling Act] preempted home-rule taxation authority." We do not agree with plaintiff's interpretation of that case. In *Des Plaines*, the court considered section 415 of the Illinois Insurance Code (215 ILCS 5/415 (West 1992)). However, in doing so, the court first set forth several other provisions of the Insurance Code. The court first noted:

> "In its declaration of public policy underlying the Illinois Insurance Code, the General Assembly stated:
>
> > '[P]ursuant to paragraphs (h) and (i) of Section 6 of Article VII of the Illinois Constitution of 1970, *** any power or function set forth in this Act to be exercised by the State is an exclusive State power or function. Such power or function shall not be exercised concurrently, either directly or indirectly, by any unit of local government, including home rule units, except as otherwise provided in this Act. Provided further that the fees, charges and taxes provided for in this Act shall, as provided for in Section 415 of this Act, be in lieu of all license fees or privilege or occupation taxes or other fees levied or assessed by any home rule unit and said Section 415 of this Act is declared to be a denial and limitation of the powers of home rule units pursuant to paragraph (g) of Section 6 of Article VII of the Illinois Constitution of 1970.' " *Des Plaines*, 267 Ill. App. 3d at 925 (quoting 215 ILCS 5/2.1 (West 1992)).

The court then set forth the language of section 415 of the Insurance Code:

> " 'The fees, charges and taxes provided for by this Article shall be in lieu of all license fees or privilege or occupation taxes or other fees levied or assessed by any municipality, county or other political subdivision of this State, and no municipality, county or other political subdivision of this State shall impose any license fee or occupation tax or fee upon any domestic, foreign or alien company, or upon any of its

- 17 -

agents, for the privilege of doing an insurance business therein, except the tax authorized by Division 10 of Article 11 of the Illinois Municipal Code ***.' " *Des Plaines*, 267 Ill. App. 3d at 926 (quoting 215 ILCS 5/415 (West 1992)).

The court determined that the language of section 415 was sufficient to deny the power of home rule units to tax "because the language of section 415 of the Illinois Insurance Code is quite explicit about both the denial and its extent." *Des Plaines*, 267 Ill. App. 3d at 926.

¶ 70 Plaintiff's argument concerning *Des Plaines* does not address the important fact that the legislature expressly provided in the earlier section that the limitations of section 415 of the Insurance Code would apply to home rule units. Such language is nowhere to be found in the Riverboat Gambling Act or the Video Gaming Act. Accordingly, we continue to adhere to our conclusion in *Midwest Gaming* that the language of section 21 of the Riverboat Gambling Act is not specific enough to restrict a home rule unit's authority to tax. Thus, the trial court properly dismissed count II of plaintiff's complaint.

¶ 71                              C. License for Revenue

¶ 72 Finally, count IV of plaintiff's complaint alleges that the Village's license fee was an unconstitutional license for revenue. As we noted in *Midwest Gaming*, the Illinois Constitution provides that "[a] home rule unit shall have only the power that the General Assembly may provide by law *** (2) to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII, § 6(e). Our supreme court has explained that " '[t]he phrase "to license for revenue" describes those situations in which a governmental unit that did not have the power to tax attempted to raise revenue by the exercise of its police power.' " *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 576 (1974) (quoting *Rozner v. Korshak*, 55 Ill. 2d 430, 433 (1973)); see also *Forsberg v. City of Chicago*, 151 Ill. App. 3d 354, 365 (1986).

¶ 73 Plaintiff argues that the Village's license fee was an impermissible "license for revenue" because the Village's power to tax was inapplicable since the license fee (1) did not pertain to the Village's government and affairs, (2) was preempted by section 21 of the Riverboat Gambling Act, and (3) was an impermissible occupation tax. However, we have considered all of these arguments above and found them to be nonpersuasive. Thus, the license fee would, at most, be a tax that the Village was authorized to impose. Accordingly, the trial court properly dismissed count IV of plaintiff's complaint.

¶ 74                                 CONCLUSION

¶ 75 For the reasons set forth above, the trial court did not err in dismissing plaintiff's amended complaint. Count III of the amended complaint was properly dismissed because the Village had the home rule authority to enact its Ordinance regulating video gaming within its boundaries. Counts I, II, and IV were properly dismissed because, even if the license fee was a tax and not a fee, the tax was not (1) an impermissible occupation tax, (2) preempted by section 21 of the Riverboat Gambling Act, or (3) an impermissible license for revenue.

¶ 76         Affirmed.